**Ben Warren BASS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 12837.**

United States Court of Appeals
Sixth Circuit.

Jan. 10, 1957.

J. E. Robinson and L. E. Gwinn, Memphis, Tenn., Robinson & Robinson, Memphis, Tenn., on brief, for appellant.

Edward N. Vaden, Memphis, Tenn., Warren Olney, III, Asst. Atty. Gen., Millsaps Fitzhugh, and Warner Hodges, U. S. Attys., Memphis, Tenn., on brief, for appellee.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant was convicted of the offense of causing a threatening letter to be de-

livered through the mail, in violation of Title 18 U.S.C.A. § 876, and was sentenced to the custody of the Attorney General for a period of eighteen months, and fined $750.

On appeal, numerous contentions are advanced on behalf of the accused: that the court erred in refusing to allow appellant's handwriting experts to examine, in advance of the trial, a "standard of comparison"—consisting of a letter dictated to appellant by an agent of the Federal Bureau of Investigation, which corresponded to the letter sent through the mail, and which was voluntarily written by appellant, upon the request of the government agent. It is also contended that there was no substantive evidence that appellant wrote or mailed the letter in question; that the letter did not show any intent on the part of the writer to injure the person mentioned therein; and that the verdict of the jury rested solely on conflicting evidence of handwriting experts. These are the principal grounds upon which appellant seeks reversal.

The background of the case is as follows: Ben Warren Bass, the appellant, owns and operates a suburban moving picture theatre in the city of Memphis, Tennessee. For some time prior to September, 1955, he had been having trouble with young boys who created disturbances in his theatre and cut up the theatre seats, which were made of foam rubber. On September 3, 1955, a six-year old boy named Butler got into some difficulty at an afternoon show. He returned home crying, and, when his mother told him that she was going over to the theatre to see Mr. Bass about the trouble, the boy told her that if she went, they would all be put in jail. Whatever actually occurred that afternoon at the theatre does not appear; but a few days later, Mrs. Butler sued Mr. Bass for false imprisonment of her son, claiming damages in the amount of $10,000. The local newspapers and even television stations prominently carried the story of the suit. On September 17, 1955, Mrs. Butler received, through the mail, the following anonymous letter:

"Mother of Dudley Eugene Butler. I suggest you take in your horns in regard to a suit against Mr. Bass. Your son, a delinquent, is just that because you are not a fit parent to bring up a child. That brat is a stinking dirty liar. You make him a delinquent by believing his lies. You give him a dime and ship him off to the show every time it opens. He has seen so many shows he is bored, but he has to go to give you a breather without him. So he whittles someone's property. He is a menace to the neighborhood. Now that he is school age the teacher has to endure him and you. Read this, too. Your brat is going to fail to show up some day and soon unless you drop this suit and apologize. If you don't, we will start our ball rolling. Maybe that is what you want. You birthed that thing. Just you wait. Taxpayer, are you?"

■■ When Mrs. Butler received the letter, she communicated with a lawyer, and, as a result, the Federal Bureau of Investigation came into the case. Shortly thereafter, Special Agent Finley, accompanied by Special Agent Stewart, called upon Mr. Bass in his office at the theatre, and after identifying themselves, explained that they were engaged in the investigation of the letter, and that they had received it from Mrs. Butler, who was involved in a lawsuit with him. They further told Mr. Bass that he did not have to make any statement, but that if he did, it could be used against him in court; and they also informed him that he had, of course, a right to consult a lawyer in the matter, if he so desired. Mr. Bass replied that he did not need to consult a lawyer, that he had done nothing wrong, that he had not written the letter, and that he would voluntarily answer any questions they wished to ask him; and he agreed to, and did, write, at the dictation of Mr. Finley, three pages of handwriting

which correspond, in language, to the letter received by Mrs. Butler. Special Agent Finley testified that he did not spell out for Mr. Bass any of the words which he dictated, and, in this, he was corroborated by Agent Stewart. Mr. Bass, however, stated that Mr. Finley did spell two of the words, "whittled" and "birthed," and, in this, there is, therefore, the only conflict of testimony between them concerning the dictated letter.

On the trial of the case, the government introduced the testimony of a handwriting expert who gave it as his opinion that the letter received through the mail by Mrs. Butler was written by the same person who wrote the specimen at the dictation of Mr. Finley, namely, the appellant, Bass. Two witnesses appearing as handwriting experts on behalf of appellant testified that the letter sent through the mail and the specimen written by Mr. Bass at Agent Finley's dictation were not written by the same person. It is unnecessary to review all the details of the testimony of the expert witnesses with respect to the numerous factors considered by them in arriving at their various opinions. In the conflict of testimony, the jury, as disclosed by its verdict, believed the government expert; and the credibility of the witnesses and the weight of the evidence are questions for the jury.

It is contended, however, that the trial court erred in refusing to allow a handwriting expert employed by appellant to examine, in advance of the trial, the standard of comparison—that is, the letter dictated by Special Agent Finley to appellant.

At the time that Mr. Finley dictated the three pages to Mr. Bass, which the latter wrote out as a specimen of his handwriting, Mr. Bass had seen the photostatic copy of the original indictment letter. Agent Finley dictated to Mr. Bass from this photostatic copy; and Mr. Bass wrote it out in longhand as Mr. Finley dictated it to him. The photostatic copy of the letter which was

sent through the mail was afterward attached to the indictment as an exhibit.

Appellant's counsel filed a motion, supported by an affidavit, asking the trial court for permission to inspect the original letter on which the indictment was founded, and the three-page exhibit written out by appellant at Mr. Finley's dictation. In the motion, it was set forth that appellant "was interviewed by an FBI Agent who dictated to him a letter identical with that incorporated in the indictment, * * * ." and that the appellant had been "advised by handwriting experts whom he has consulted that an inspection of the originals of said documents is essential to a proper comparison of his handwriting with that of the letter made the basis of the indictment."

It appears that appellant's counsel, at all times, had access to the original letter, upon which the indictment was based, for the purpose of examination, both by themselves and their expert witnesses. But, in disposing of appellant's motion, the court held that while the original letter upon which the indictment was based could be examined by appellant's counsel and his expert witnesses, there was no reasonable ground to require the government to produce the specimen of handwriting which appellant voluntarily gave to Agent Finley. Appellant's counsel already had had access to this specimen and had examined it; but the court, in its order, denied appellant's handwriting experts the right to photograph and examine it; and this ruling of the trial court is claimed by appellant to constitute reversible error.

It appears that, subsequent to its ruling, and on the first day of the trial of the case—which lasted three days—the court suggested to government counsel that they make available to appellant's counsel the specimen of handwriting which appellant gave to Agent Finley, so that appellant's experts "could have the benefit of that paper writing." It does not appear from the evidence that appellant's experts photographed the spec-

imen, although, in a colloquy, government counsel declared that appellant's experts did subsequently actually photograph it. When government counsel stated that unless appellant's counsel would stipulate that their expert witnesses had examined the specimen in question, one of the government counsel would take the witness stand and testify that appellant's experts did examine it, appellant's counsel refused to stipulate—and government counsel did not thereafter testify. There is no satisfactory evidence that appellant's witnesses were ever permitted to examine and photograph the specimen of handwriting which appellant had given Agent Finley. But assuming that they were allowed to examine it only after the trial was under way—and it appears from the colloquy that they were so permitted —there arises a grave question whether appellant had a fair chance to prepare his case for defense.

It is to be emphasized that appellant was charged with a serious crime—sending an anonymous letter through the mail, addressed to a mother, threatening injury to her child. Appellant was a man of unblemished reputation, as was vouched for by a number of outstanding citizens of his community. The sole evidence against him was a specimen of handwriting which he had voluntarily given to the government, together with the testimony of a government agent that the handwriting in this specimen was the same as in the anonymous letter. The only issue was whether the handwriting in both documents was the same —whether they were written by the same man. How to resolve this issue? By expert witnesses on handwriting. The government expert was a member of the Federal Bureau of Investigation who had completed a two-year course in document identification, and had thereafter worked as a document examiner in the laboratory of the Federal Bureau of Investigation for eight years. The appellant's expert had been, for sixteen years, an examiner of questioned documents in the Post Of-

fice Department, and had instructed and trained document-examiners for that department of the federal government for eleven years. Appellant's expert witness and the government's expert witness completely disagreed in their expert opinions as to whether the handwriting in the specimen given by appellant was the same as in the anonymous letter.

The government witness, however, had, in the Federal Bureau of Investigation laboratory, all the time he desired, to examine the documents and to photograph them, which he did, making enlargements five times the size of the documents themselves and comparing them in minute details. Enlarging specimens of handwriting, by photography, appears generally to form the basis of the conclusions of expert witnesses with regard to questioned documents. It is easier, in this way, to note and study the similarities and contrasts between one specimen of handwriting and another; and the crucial testimony which convicted appellant resulted from such examination and photography of the documents, and the extensive study made of them, by the government witness.

The question of appellant's guilt depended upon the testimony of the government's handwriting expert. If the jury believed him, appellant would be found guilty. The jury did believe him, and, accordingly, convicted the appellant. Because the testimony of this witness was of supreme importance to both the government's case and appellant's case, appellant's counsel had the right and duty to subject him to the most searching cross-examination. Counsel for appellant knew that the government was relying on one point—that the handwriting in the anonymous letter was the same as in the specimen voluntarily furnished by appellant. They knew that the government had photographed these documents, and presumably had enlarged them by photography—as the government actually did—it being common knowledge that this is the method used by experts in examining questioned doc-

uments and testifying about them. Appellant's counsel knew too that the government's expert witness would testify that the handwriting in both documents was the same, and would use the photographic enlargements and his testimony thereon to support his stand.

In order to cross-examine the government's expert witness, appellant's counsel should have been allowed to examine, photograph, and enlarge the handwriting of the two documents in question. In that way, they could prepare to attack the testimony of the government witness who was going to base or substantiate his opinion upon those enlargements. To prepare for such a cross-examination, appellant's counsel should have been allowed to submit to their expert witness the same enlarged photographs upon which the government witness was basing his opinion.

In their motion asking the trial court for the right to photograph, before trial, the specimen voluntarily given by appellant to Agent Finley, and the anonymous letter, one of appellant's counsel set forth, in an affidavit, that he had been informed by qualified experts on the examination of questioned documents, that an accurate opinion could not be furnished concerning handwriting identification without an examination of the questioned handwriting and the standard of comparison in the original form, and that "a reasonable time is necessary for examining any questioned handwriting and proper illustration of the reasoning supporting opinions reached; that a reasonable time usually required to accomplish this is a minimum of three (3) to four (4) days and possibly a week."

We are of the opinion that the motion of appellant to examine both original documents before trial and to photograph them under such conditions as the court would deem proper should have been granted. The government examined both original documents and photographed them before trial. Appellant should also have been allowed to do so. The fact that appellant may have been granted the right, by government counsel, to have expert witnesses examine the original documents and photograph them, only after the comparatively short trial had begun, may well have deprived appellant's counsel of sufficient preparation to secure expert advice as to the documents, and to prepare sufficiently for their cross-examination of the government's expert witness. Moreover, in accordance with Rule 16 of the Federal Rules of Criminal Procedure, appellant's request to examine and photograph the original documents should have been granted.[1]

Government counsel argue that any fair-minded person would admit that appellant was the "logical person" to write and send the threatening letter. If appellant sent the letter, it was certainly the most foolish thing that he could have done, under the circumstances, after he had been sued by the boy's mother. Obviously, from the language used in the letter, he would be immediately suspected on the ground of motive and because of calling upon her to drop the suit and apologize to appellant. Of course, it is to be remembered that guilty men sometimes do the most foolish things to convict themselves. With regard to the investigation of the threatening letter, Agent Finley, however, took handwriting specimens of several per-

1. Rule No. 16 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides:

"*Discovery and Inspection.* Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, obtained from or be-

longing to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. The order shall specify the time, place and manner of making the inspection and of taking the copies or photographs and may prescribe such terms and conditions as are just."

sons—a young woman employed in appellant's office, his manager, his wife, and others friendly to appellant for the purpose of comparing such handwriting with that in the threatening letter, obviously on the assumption that someone friendly to appellant might have concocted it; and the incident of the destruction of the property in the theatre by so-called delinquents and the attendant publicity of the suit against appellant, both in the newspapers and on television, could set off any peculiar mind addicted to writing threatening letters. Of course, the jury is the sole judge of the facts. But where the only evidence against one charged with crime is a handwriting exhibit, there should be given to counsel every opportunity to probe the validity and persuasiveness of such evidence. Appellant had a right equal to that of the government to use the same documents in the same way to prepare for trial. A denial of this right calls for reversal.

Certain questions may arise on retrial, and we take this occasion, therefore, to dispose of other contentions made on this appeal. As to the claim that the government's proofs failed to show that the indictment letter did not disclose any intent on the part of the writer to injure the person named therein, such proof was unnecessary since proof of violation of the statute does not require evidence of intent to injure.

It is argued that the letter sent through the mail was not a letter containing a threat to injure another. The anonymous letter stated that the six-year old boy was a menace to the neighborhood; that he was going to disappear, or, rather, "fail to show up home some day *and soon* unless you drop this suit and apologize. If you don't, we will start our ball rolling. * * * Just you wait." (Emphasis supplied.) We fail to find reversible error in the charge of the court or in its failure to charge with respect to whether the letter contained a threat to injure.

We have considered the other contentions advanced by appellant and find them to be without substance.

In accordance with what has been previously said, the judgment is set aside, and the case remanded for a new trial.