UNITED STATES of America, Appellee,

v.

Russell KELNER, Appellant.

No. 396, Docket 75-1290.

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1975.

Decided April 9, 1976.

Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D. C., for appellant.

Robert J. Costello, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, Don D. Buchwald and John D. Gordan III, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MULLIGAN, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a conviction for causing to be transmitted in interstate commerce a communication containing a "threat to injure the person of another," 18 U.S.C. §§ 2, 875(c).[1] The offense charged in the indictment was that Russell Kelner, a member of the Jewish Defense League (JDL), caused to be transmitted in interstate commerce a threat to assassinate Yasser Arafat. Kelner was convicted after a jury trial in the United States District Court for the Southern District of New York, before Richard Owen, *Judge.* He was sentenced to imprisonment for one year with execution suspended, placed on probation for four years and given a $1,000 committed fine. We affirm.

The objective facts are not seriously disputed. On November 11, 1974, Yasser Arafat, leader of the Palestine Liberation Or-

---

1. 18 U.S.C. § 2 provides:

    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 875(c) provides:

    Whoever transmits in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

ganization (PLO), was to be in New York to attend a session of the United Nations General Assembly which he had been invited to address. Both his presence in New York and his invitation to appear before the United Nations had aroused resentment among American Jews, particularly in New York City. About 5:30 p. m. on that day United Press International (UPI) received notification from the JDL of a news conference to be held later that evening at JDL headquarters. UPI thereupon notified its assorted radio, television and newspaper customers of the upcoming news event. One of those notified was WPIX–TV (Channel 11), a licensed television station in New York City with a telecast range of 50 miles extending into Connecticut and New Jersey. The station had previously dispatched WPIX reporter John Miller to cover a JDL demonstration in front of the Waldorf-Astoria Hotel in Manhattan where Arafat and a PLO delegation were expected to stay.[2]

After attending the demonstration, Miller was assigned to cover the JDL press conference. When he and his film crew arrived at the JDL headquarters the conference had already started. Appellant, Kelner, was seated in military fatigues behind a desk with a .38 caliber "police special" in front of him. To Kelner's right another man was dressed in military fatigues. Miller heard one of the several reporters at the conference ask Kelner whether he was talking about an assassination plot and heard Kelner answer in the affirmative. The WPIX crew quickly filmed general shots of the press conference without sound for use as a "lead-in" on the news and then began filming an actual interview of Kelner by Miller. The reporter, holding a microphone with the WPIX channel number in large numerals on it, asked Kelner to go ahead and the following exchange took place:

Kelner: We have people who have been trained and who are out now and who intend to make sure that Arafat and his lieutenants do not leave this country alive.

Miller: How do you plan to do that? You're going to kill him?

Kelner: I'm talking about justice. I'm talking about equal rights under the law, a law that may not exist, but should exist.

Miller: Are you saying that you plan to kill them?

Kelner: We are planning to assassinate Mr. Arafat. Just as if any other mur— just the way any other murderer is treated.

Miller: Do you have the people picked out for this? Have you planned it out? Have you started this operation?

Kelner: Everything is planned in detail.

Miller: Do you think it will come off?

Kelner: It's going to come off.

Miller: Can you elaborate on where or when or how you plan to take care of this?

Kelner: If I elaborate it might be a problem in bringing it off.

Following the interview, the film was reviewed at the WPIX studios where the film editors determined that it should be televised on the ten o'clock WPIX Channel 11 news that evening with the tape of the exchange above quoted in unedited form. The exchange between Kelner and Miller was then broadcast on television in its entirety and constituted the principal evidence of the Government at the trial. We have seen the videotape as it was played for us at the oral argument of this appeal.

Several character witnesses testified on Kelner's behalf at the trial. Kelner himself testified that at the time his statements were made neither he nor the JDL had any plans to carry out an assassination attempt but that what he was trying to convey was a JDL response to threats from the PLO. Kelner claimed that his sole objective was

2. No evidence was adduced at trial to prove that Arafat or his aides had arrived in New York, or were even in the United States, at the time of the alleged threat or of its subsequent telecast on the ten o'clock news that evening. This omission is not important in view of our disposition of appellant's second claim for reversal, *infra*.

to show the PLO that "we [as Jews] would defend ourselves and protect ourselves and . . . [that the PLO] would not be able to accomplish anything in accordance with their threats."

Appellant makes five claims on this appeal. Our acceptance of any one of the first four would require reversal of the conviction and dismissal of the indictment; acceptance of the fifth claim would require a remand for a new trial. The first point argued for reversal is that Kelner did not "cause" the transmission of a communication in interstate commerce within the meaning of 18 U.S.C. § 2, note 1 *supra,* because his alleged threat was made in the context of a television news interview and it was the wholly independent conduct of the television station that resulted in the film of the interview being telecast throughout metropolitan New York on the television news. The second is that there was no "communication" within the statute, 18 U.S.C. § 875(c), note 1 *supra,* because there was no specific addressee of the alleged threat, that is to say, the appellant was not expecting Arafat to watch the WPIX ten o'clock news and there was no evidence that the "threat" actually reached Arafat. Appellant's third claim is that there was no communication "in interstate commerce" within the statute because even though WPIX televises beyond the borders of New York the communication did not have to cross state lines to travel from Kelner to Arafat. The fourth and most troubling of appellant's claims is that the statements made were not "threats" within the meaning of the statute because appellant had no intention of actually using force and the statements were only "political hyperbole." Kelner has also asked for a remand for a new trial on the basis that the prosecutor was improperly allowed to cross-examine appellant's reputation witnesses in connection with arrests occurring *after* the alleged offense here involved.

Appellant's first point is by no means unique to offenses charged under 18 U.S.C. § 875(c). Although grounded in the statutory language of 18 U.S.C. § 2, the argu-ment that a person cannot be liable for criminal conduct which he has not "caused" has been a premise of our criminal law from its very origin. Cases such as *Terry v. United States,* 131 F.2d 40, 44 (8th Cir. 1942), and *United States v. Fox,* 95 U.S. 670, 671, 24 L.Ed. 538, 539 (1878), have long recognized that "[u]pon principle, an act, which is not an offense at the time it is committed cannot become such by any subsequent independent act of [a] party with which it has no connection." *Id. See also United States v. Dietrich,* 126 F. 676, 685 (8th Cir. 1904). However, viewing the evidence in this case most favorably to the Government's position, as the jury verdict requires us to do, it is apparent that Kelner willfully caused the transmission of his threat over the WPIX facilities in that he took action without which the communication would not have occurred, intending (or at least reasonably foreseeing) that his statement would be transmitted in interstate commerce by others. It is clear enough that a person may be held responsible as a principal under 18 U.S.C. § 2(b), *see* note 1 *supra,* for causing another to do an act which would not have been criminal if it had been performed independently by that other person. *United States v. Kelley,* 395 F.2d 727, 729 (2d Cir.), *cert. denied,* 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968); *United States v. Lester,* 363 F.2d 68, 72–73 (6th Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967). It is a general principle of causation in criminal law that an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries. *See, e. g., United States v. Giles,* 300 U.S. 41, 48–49, 57 S.Ct. 340, 344, 81 L.Ed. 493, 497–498 (1937); *United States v. Scandifia,* 390 F.2d 244, 249 (2d Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed. 297 (1969). The charge at appellant's trial closely followed the language of *United States v. Scandifia, supra,* stating that appellant could be found to have "caused" the transmission of the al-

leged threat in interstate commerce if he made the threat in fact and intended, or could reasonably have foreseen, that the threat would be transmitted by WPIX–TV. The fact that WPIX made an editorial decision to publicize the news does not render this basic principle of criminal law inapposite. It is unnecessary that the intermediary who commits the forbidden act have a criminal intent.[3] *See United States v. Bryan,* 483 F.2d 88, 92 (3d Cir. 1973) (en banc); *United States v. Lester, supra. See also Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435, 444 (1954) (delivery of check drawn on out-of-state bank to local bank for collection "caused" it to be transported in interstate commerce as deliverer intended local bank to send check to drawee bank for collection); *Kolod v. United States,* 371 F.2d 983 (10th Cir. 1967), *vacated on oth er grounds,* 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968) (evidence sufficient where it permits inference that defendant could have reasonably anticipated interstate ramifications of his threat or of the wrongful conduct of those with whom he was associated). Here the evidence was quite clear that the JDL called the press conference and that during the conference Kelner knew that he was being interviewed by television when he made the threat. Appellant does not seriously dispute the sufficiency of the evidence in this regard. The cases which appellant has cited to us, *Terry v. United States, supra, United States v. Fox, supra,* and *United States v. Dietrich, supra,* all involved an intervening act by a third party that could *not* have been foreseen or was against the will of the alleged defendant. Those cases are plainly inapposite at this appeal.

Appellant argues that there was no "communication" within the meaning of 18 U.S.C. § 875(c) because there was no specific person to whom the threat was addressed and to whom the defendant intended to cause emotional suffering. The claim is that the broadcast of the threat to an indefinite and unknown audience is not a "communication" of that threat. The mere statement of this argument suggests its improbability. Congress could not have intended to have left such a gaping hole in its statutory prohibition against the communication of threats in commerce. If appellant's contention were accepted, any would-be threatener could avoid the statute by seeking the widest possible means of disseminating his threat. Publication of the threat in 100 major newspapers, even though it would reach only an "indefinite and unknown audience," would be as sure a means of communicating the threat to the victim as would calling him on the telephone. Our concern under the statute is not whether the means of communication chosen by the appellant caused the threat to reach "an indefinite and unknown audience," but whether the appellant intended to communicate his threat to Arafat through the chosen means, the television interview. As Judge Owen quite properly charged, it was sufficient to support the conviction of Kelner if the jury found that in his use of the means of the televised press conference Kelner held "a specific intent to communicate a threat to injure." *United States v. Holder,* 302 F.Supp. 296, 299 (D.Mont.1969), *aff'd,* 427 F.2d 715 (9th Cir. 1970). It was not necessary under the statute for the Government to prove that appellant had a specific intent or a present ability to carry out his threat, 302 F.Supp. at 300; *see also Bass v. United States,* 239 F.2d 711, 716 (6th Cir. 1957), but only that he intended to communicate a threat of injury through means reasonably adapted to that purpose. We have no doubt that appellant's activity is properly within the scope of the term "communication" as used in 18 U.S.C. § 875(c).

Appellant's next argument is based upon his allegation that Arafat and his aides

---

**3.** It is, therefore, unnecessary for us to consider whether the television station is protected by the First Amendment from prosecution under 18 U.S.C. § 875(c) for its role in the transmission of Kelner's threat in interstate commerce.

Assuming that the First Amendment shields this form of "news publication," Kelner's act is not cleansed of its criminality by his use of an immunized intermediary.

were in New York City at the time that Kelner's threat was made.[4] From this assumption, appellant argues that there could have been no communication of the threat "in interstate commerce" since both the appellant and Arafat were in the same state at the time the threat was made. This argument, however, misapplies both the language and the scheme of the statute. The statute does not require that the communication between Kelner and Arafat be in commerce; rather, it requires that the threat which is communicated be *transmitted* in commerce. Kelner's choice of a method of transmitting his threat, a telecast reaching three states which is plainly "in commerce," brings him within the literal scope of the statute. Appellant contends, however, that the nexus of his activity was predominantly local, and that the statute should not be read literally to reach into spheres of primarily local concern. However much we might agree as a matter of principle that the congressional reach should not be overextended or that prosecutorial discretion might be exercised more frequently to permit essentially local crimes to be prosecuted locally, *see* H. Friendly, Federal Jurisdiction: A General View 58–59 (1973), we do not feel that Congress is powerless to regulate matters in commerce when the interstate features of the activity represent a relatively small, or in a sense unimportant, portion of the overall criminal scheme. *See, e. g., Cleveland v. United States,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (white slave traffic); *Whitaker v. United States,* 5 F.2d 546 (9th Cir.), *cert. denied,* 269 U.S. 569, 46 S.Ct. 25, 70 L.Ed. 416 (1925) (interstate transportation of stolen autos). Our problem is not whether the nexus of the activity is "local" or "interstate"; rather, under the standards which we are to apply, so long as the crime involves a necessary interstate element, the statute must be treated as valid. Here, as in *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the constitutional basis for the statute is the withdrawal of interstate facilities for the achievement of the proscribed evil. Since the statutory offense of which appellant has been convicted necessarily involves the use of an interstate facility for transmission of his threat, we are satisfied that the statute and conviction are sufficiently commerce-related to support federal prosecution.

Appellant's fourth argument for reversal is that his statements were not "threats" within the meaning of the statute because they were, rather, political hyperbole, and that the case should not, therefore, have been submitted to the jury. *See Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, 667 (1969), *rev'g,* 131 U.S.App.D.C. 125, 402 F.2d 676 (1968); *id.,* 402 F.2d at 686 (Wright, *J.,* dissenting). Appellant additionally claims that to save 18 U.S.C. § 875 from constitutional invalidity as an infringement of the right to free speech there must be evidence of specific intent on his part to carry out the threat as well as a statement unambiguously constituting a threat on the life of Arafat and his aides. He suggests that the statement which he made was a communication of information or opinion that "justice" and "equal rights" demanded that Arafat be treated as a murderer in view of assorted PLO crimes on innocent Israeli civilians. He points out that since the threat was broadcast to the general public it is especially deserving of constitutional protection under the First Amendment because it relates to the "free trade in ideas," *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173, 1180 (1919) (Holmes, *J.,* dissenting), or "the power of reason as applied through public discussion," *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1105 (1927) (Brandeis, *J.,* concurring), overruled by *Brandenburg v. Ohio,* 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).[5]

---

4. *See* note 2 *supra.*

5. He also argues that the "threat" here was not a carefully thought-out communication, but was the innocent result of the usual "give and take" between reporters and an individual. This argument, however, is one properly addressed to the jury which found otherwise.

But it cannot be said as a matter of law that appellant was stating only ideas. He said, after all,

> We have people who have been trained and who are out now and who intend to make sure that Arafat and his lieutenants do not leave this country alive . . . . We are planning to assassinate Mr. Arafat . . .. Everything is planned in detail.

The court left it to the jury to determine whether Kelner "intended the words as a threat against Yasser Arafat and his lieutenants . . . or whether he said those words as a statement of opposition to Arafat . . .." The court charged the jury that "[m]ere political hyperbole or expression of opinion or discussion does not constitute a threat" and stated that if the jury found that the statements were "no more than an indignant or extreme method of stating political opposition to Arafat or the PLO" it would be justified in "finding that no threat was in fact made." The jury finding of guilty, therefore, is predicated on the judgment that there was here a genuine threat to kill which, even though it might have been made in the context of a protest against PLO outrages, did not constitute only a political expression of opinion. In order to convict under the charge given, the jury had to, and we must assume did, find that the statements were *more* than political, that they were "an expression of an intention to inflict" injury, of "such a nature as could reasonably induce fear."

They were also made "knowingly and willfully," as the judge defined those terms, "comprehended" by the appellant and "voluntarily and intentionally uttered . . . with the apparent determination to carry them into execution." [6] They were not made conditionally or in jest. Since it is the utterance which the statute makes criminal, not the specific intent to carry out the threat, we think the charge adequately instructed on the statutory elements of the crime. Only if the Constitution requires that we read into the offense the element of specific intent to carry out the threat would the charge given be deficient.

On the most elementary level it would seem possible to conclude that a threat of murder falls within the narrow class of "fighting words" which are so inherently deleterious to social order, see *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942); *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213, 1220 (1940), and so inherently unrelated to the "robust" political debate necessary to a democratic society, see *Watts, supra,* 402 F.2d at 683 n.17, that the umbrella of the First Amendment does not protect the threat from governmental restriction. We do not, however, rest on this simplistic and perhaps misleading proposition. Professor Emerson points out that both *Chaplinsky* and *Cantwell* were cases involving the use of expression that might lead to a breach of the peace in the streets, that is to say, they were incite-

**6.** Although the statute under which appellant was convicted, 18 U.S.C. § 875, does not expressly require that the threat to injure be transmitted "willfully," the trial judge followed *Ragansky v. United States,* 253 F. 643, 645 (7th Cir. 1918), and charged the element of willfulness in terms of "an apparent determination" to carry the threat into execution. *Cf. Pierce v. United States,* 365 F.2d 292, 294 (10th Cir. 1966). In *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, 667 (1969), the Supreme Court expressed "grave doubts" about the *Ragansky* definition, but the statute in *Watts,* 18 U.S.C. § 871, *did* actually require that threats be made "willfully." Furthermore, cases decided since *Watts* under the *Watts* statute have almost uniformly held that no proof of actual intent to carry out the threat is required by the use of the word "willfully" in the statute, so that a *Ragansky* definition may be said to be adequate here. *United States v. Hall,* 493 F.2d 904, 905 (5th Cir. 1974), *cert. denied,* 422 U.S. 1044, 95 S.Ct. 266, 45 L.Ed.2d 696 (1975); *United States v. Rogers,* 488 F.2d 512, 514 (5th Cir. 1974), *rev'd and remanded on other grounds,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Lincoln,* 462 F.2d 1368, 1369 (6th Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972); *United States v. Hart,* 457 F.2d 1087, 1090–91 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972); *United States v. Compton,* 428 F.2d 18, 21 (2d Cir. 1970), *cert. denied,* 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971); *Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir. 1969). *But see United States v. Patillo,* 438 F.2d 13, 16 (4th Cir. 1971) (en banc).

ment cases. T. Emerson, The System of Freedom of Expression 313–15 (1970). Here the crime charged is not that appellant was inciting others to assassinate Arafat but that he himself was threatening to do so. The question remains, therefore, whether an unequivocal threat which has not ripened by any overt act into conduct in the nature of an attempt is nevertheless punishable under the First Amendment, even though it may additionally involve elements of expression.

On that question we believe we have help from *Watts, supra,* 394 U.S. at 705–08, 89 S.Ct. at 1399–1400, 22 L.Ed.2d at 664–665. The statute involved in that case, 18 U.S.C. § 871, punishing threats to the life of the President, was found to be "constitutional on its face," given the "overwhelming" interest of the Congress in protecting the safety and freedom of movement of the Chief Executive in performing his duties. 394 U.S. at 707, 89 S.Ct. at 1401, 22 L.Ed.2d at 666. Although the statute under which Kelner has been convicted makes it a criminal act to transmit threats to persons generally, we believe that important national interests similar to those in *Watts* exist here, more specifically, the governmental interest of reducing the climate of violence to which true threats of injury necessarily contribute.[7] As a part of the Government's constitutional responsibility to insure domestic tranquility, it is properly concerned—in an era of ever-increasing acts of violence and terrorism, coupled with technological opportunities to carry out threats of injury—with prohibiting as criminal conduct specific threats of physical injury to others, whether directed toward our own or another nation's leaders or members of the public. However, as the court said in

*Watts,* even when such valid governmental interests are identified and accepted, a statute such as the one here "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Id.*

In confronting this problem of interpreting the threat statute consistently with the First Amendment, the Supreme Court did not accept the solution argued for by appellant and by Judge J. Skelly Wright, dissenting in *Watts, supra,* 402 F.2d at 687, of conditioning conviction upon proof of a specific intent to carry out the threat made. In alleviation of Judge Wright's concerns lest men go unprotected by the First Amendment and be convicted "of using offensive language, with some implication against the President's life, which [is] meant as jest, as rhetoric," *id.* at 689, the Court construed the word "threat" to exclude statements which are, when taken in context, not "true threats" because they are conditional and made in jest. 397 U.S. at 708, 89 S.Ct. at 1401, 22 L.Ed. at 667. In effect, the Court was stating that threats punishable consistently with the First Amendment were only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected "vehement, caustic . . . unpleasantly sharp attacks on government and public officials." *See New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). We believe that this limitation upon the word "threat" is a construction which satisfies First Amendment concerns as fully as would appellant's and Judge Wright's requirement that specific intent to carry out the threat be proven.[8]

---

**7.** In the lower court opinion in *Watts v. United States,* 131 U.S.App.D.C. 125, 402 F.2d 676, 683 (1968), then Circuit Judge Burger noted in passing that "[a] statute making it a criminal act to utter threats as to citizens generally might well be open to constitutional challenge." He did not mention the statute here, enacted in 1948, nor did he discuss what national interests might be advanced specifically to support such a statute. We do not attach to

this dictum controlling weight in our evaluation of the sufficiency of the national interests here.

**8.** We are aware that Judge Wright in his dissent, *Watts, supra,* 402 F.2d at 690–91 & n.11, declared that he had no doubt that the "clear and present danger" test applied to the threat statute there, 18 U.S.C. § 871, and required that the intent of "willfully" there be read to require specific intent to execute the threat. We are by no means certain that the "clear and present danger" test in any of its various formula-

The purpose and effect of the *Watts* constitutionally-limited definition of the term "threat" is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are, as Judge Wright recognizes, "properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues." *Watts, supra,* 402 F.2d at 690. The *Watts* requirement of proof of a "true threat," it may be seen, works ultimately to much the same purpose and effect as would a requirement of proof of specific intent to execute the threat because both requirements focus on threats which are so unambiguous and have such immediacy that they convincingly *express* an *intention* of being carried out. These qualities of unequivocal immediacy and express intention are the most, perhaps, that even Judge Wright's and the appellant's proposed requirement of specific intent could demand in any event since such an intent may be proved circumstantially; the jury under that test would have the "almost impossible task of evaluating [a defendant's] subjective mental processes in relation to executing his apparent intent as that intent was manifested by his words and gestures in context." *Id.* at 684 (opinion of Burger, *Circuit Judge*).

It is for these reasons that we believe a narrow construction of the word "threat" in the statute here, 18 U.S.C. § 875(c), as approved in *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401, 22 L.Ed.2d at 667, is consonant with the protection of First Amendment interests. Even where the threat is made in the midst of what may be other protected political expression, such as appellant's reference to "justice" and "equal rights under the law," the threat itself may affront such important social interests that it is punishable absent proof of a specific intent to carry it into action when the following criteria are satisfied. So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied. This clarification of the scope of 18 U.S.C. § 875(c) is, we trust, consistent with a rational approach to First Amendment construction which provides for governmental authority in instances of inchoate conduct, where a communication has become "so interlocked with violent conduct as to constitute for all practical purposes part of the [proscribed] action itself." T. Emerson, *supra,* at 329.[9]

tions—even the most recent, in *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)—is appropriate in this case. Although it may be true that the "historic standard" has survived in a particular formula in contempt of court cases, *see Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), it has not been relied upon by the Supreme Court in the field of its nascence (government control over the advocacy of violence) since *Dennis. See Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). In reversing in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 644 (1969), moreover, the Supreme Court did not adopt Judge Wright's use of the test, but instead fashioned an alternative method of statutory construction of 18 U.S.C. § 871 as a "true threat" statute to prevent any conflict with the First Amendment.

9. T. Emerson, The System of Freedom of Expression 404–05 (1970), has the following to say regarding the analogous crime of solicitation:

> The issue should be resolved in terms of the usual rules for determining what is expression and what is action. Under these doctrines solicitation can be constitutionally punished only when the communication is so close, direct, effective, and instantaneous in its impact that it is part of the action. The speaker must, in effect, be an agent in the action.
>
> With respect specifically to solicitation cases, certain more concrete considerations can be suggested. The more general the communication—the more it relates to general issues, is addressed to a number of persons, urges general action—the more readily it is classified as expression. On the other hand, communication that is specifically concerned with a particular law, aimed at a particular person, and urges particular action, moves closer to action. Communication also tends to become action as the speaker assumes a personal relation to the listener,

The question of the application of the First Amendment to the statute here is properly for the court rather than the jury under *Dennis v. United States,* 341 U.S. 494, 511–15, 71 S.Ct. 857, 868–870, 95 L.Ed. 1137, 1153–1155 (1951).[10] We must determine under the circumstances of this case whether appellant's statement unambiguously constituted an immediate threat upon the life or safety of Arafat and his aides. As we have already indicated, appellant's language met the criteria we have set forth. It was not made in a jesting manner; the military uniforms and the presence of the .38 pistol emphasize this. The language was unequivocal and unconditional: "We are planning to assassinate Mr. Arafat." It was immediate: "We have people who have been trained and who are out now . .." It was specific as to target: "Arafat and his lieutenants." Therefore, in accordance with the above, we conclude that the threat was within the constitutionally permissible scope of the statute and we reject appellant's fourth claim of error.[11]

With regard to appellant's final argument, we hold that the cross-examination of Kelner's character witnesses was proper. Of first note is the fact that the failure of appellant to object below should preclude his objection here. *United States v. Indiviglio,* 352 F.2d 276 (2d Cir. 1965) (en banc), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Even had timely objection been made, however, the cross-examination of the witnesses was proper. The four character witnesses had testified as to Kelner's present reputation for peacefulness as well as for truth and veracity. As such, evidence postdating the indictment but predating the witness's testimony was relevant and cross-examination of the witnesses regarding their awareness of appellant's post-indictment arrest was proper. *United States v. Lewis,* 157 U.S.App.D.C. 43, 482 F.2d 632, 643 (1973). The allowable scope of the impeaching inquiry should be tested by comparison with the reputation asserted. *Michelson v. United States,* 335 U.S. 469, 483–84, 69 S.Ct. 213, 222, 93 L.Ed. 168, 177–78 (1948). We would be hard put, moreover, even if there were error in this respect, to find such error other than harmless.

Judgment affirmed.

MULLIGAN, Circuit Judge (concurring):

I agree that the conviction of the appellant Kelner must be affirmed. The language of the threat and the circumstances in which it was made as set forth in Judge Oakes's opinion are in my view clearly within the statute [18 U.S.C. § 875(c)] and do not constitute protected speech within the First Amendment. The threat here cannot be sensibly characterized as an "exposition of ideas," *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed.

deals with him on a face-to-face basis, or participates in an agency or partnership arrangement. Other factors may affect the ultimate determination of whether the communication is expression or action. The essential issue is whether the speaker has made himself a participant in a crime or attempted crime of action. Short of this the community must satisfy itself with punishment of the one who committed the violation of law or attempted to do so, not punishment of the person who communicated with him about it.

**10.** In referring to *Dennis,* as an inferior court we must accept its formulation of the respective roles of judge and jury in free speech cases, *see* Richardson, *Freedom of Expression and the Function of Courts,* 65 Harv.L.Rev. 1, 24–31 (1951), although we recognize that formulation is itself subject to serious doubts. *See* Rostow, *The Democratic Character of Judicial Review,* 66 Harv.L.Rev. 193, 216–23 (1952). Of course, our overall problems in this regard are not made any simpler by what Professor Emerson has called the "chaotic state of First Amendment theory" as it has been from time to time set forth by the Court. *See* T. Emerson, note 9 *supra,* at 16.

**11.** Judge Mulligan's concurring opinion, with all respect, does not take into account that portion of the opinion in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), which states that "a statute such as this one which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." 394 U.S. at 707, 89 S.Ct. at 1401, 22 L.Ed.2d at 667.

1031, 1035 (1942) or the "communication of information or opinion," *Cantwell v. Connecticut,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 1221 (1940).

The reason for this separate opinion is that I cannot accept Judge Oakes's obiter dicta, "So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute [18 U.S.C. § 875(c)] may properly be applied." There is no doubt that the threat here is well within the rule announced. However, I see no reason to set forth a test for future cases which may well involve threats within the statute and not protected by the First Amendment, but which would not fall within the proposed rubric.

For example, if the threat here had been made in the same setting but had been phrased, "We plan to kill Arafat a week from today unless he pays us $1,000,000," I would hold that the threat is still well within § 875(c) and not protected under the First Amendment although the threatened homicide is not immediate, imminent or unconditional under the test proposed by Judge Oakes. We have already held that a threat to assassinate the President some two weeks later is within a comparable statute, 18 U.S.C. § 871. *United States v. Compton,* 428 F.2d 18 (2d Cir. 1970), cert. denied, 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971). Although the opinion does not advert to the issue of immediacy, I would not think that that argument would change the result.

It is true that in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) [1] the Court, in reversing a conviction under § 871, characterized a threat to assassinate President Johnson as conditional. However, the setting was entirely different from that encountered here. The defendant there was an eighteen-year-old who was participating in a public rally of the W.E.B. DuBois Club on the Washington Monument grounds. He joined a gathering scheduled to discuss police brutality. After a suggestion by one member of the group that young people get more education before expressing their views, the defendant stated:

> They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.

394 U.S. at 706, 89 S.Ct. at 1400, 22 L.Ed.2d at 666. I do not think that *Watts* stands for the proposition that a conditional threat is necessarily protected by the First Amendment. The circumstances of the threat made in that case indicate that the assassination was impossible since the defendant never intended to serve in the Armed Forces; that it was considered as a joke by the audience and that it was made in a setting of political and social discussion which should be encouraged and not condemned.

In sum, I believe that in view of the myriad circumstances which will attend the making of such threats and the rich vocabulary of invective available to those prone to indulge in the exercise condemned by the statute, the better course here is to decide each case on its facts, at least until such time as the Supreme Court provides further elucidation. Moreover, the proposed requirement that the threat be of immediate, imminent and unconditional injury seems to me to be required neither by the statute nor the First Amendment.

MESKILL, Circuit Judge (concurring):

Reluctantly I must concur that Kelner's actions come within the literal terms of 18

---

1. The judgment of the Court was rendered in a per curiam opinion, with a separate concurrence by Justice Douglas. Justice White dissented without opinion, and Justices Stewart, Fortas and Harlan would have denied certiorari.

U.S.C. §§ 875(c), 2. I do not believe, however, that Congress ever intended this statute to apply to the type of television news broadcast incident involved here.

The admittedly sparse legislative history behind this enactment reveals that it originally was aimed at the interstate transportation of extortion messages. After its passage, but long before the advent of television, the statute was broadened to apply to non-extortion cases involving "any" interstate communication of "any" threat. Prosecutions pursuant to § 875(c) and its relatives §§ 871 and 876 have involved interstate threats made by telephone and mail, all situations involving some direct and immediate action by a threatener in communicating the threat against a particular recipient. *See, e. g., United States v. Bozeman,* 495 F.2d 508 (5 Cir. 1974), *cert. denied,* 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975) (telephone threats); *United States v. LeVison,* 418 F.2d 624 (9 Cir. 1969) (telephone and mail threats). Furthermore, by utilizing the aforementioned modes of transmission, the threatener, by paying for the use of the telephone or mail, was entitled to interstate delivery of his message; the mailman or telephone operator who transmitted the threat was truly an "innocent dupe." No other case involves activity like Kelner's, which is so detached from the act of transmission itself.

Whatever Kelner may have foreseen, or for that matter whatever he may have wished to happen to his statement at the time he mouthed it, he nevertheless had no control over his threat once it was made. Instead, the decision whether or not to broadcast, which in effect determined whether or not a crime was committed, rested within the discretion of the television personnel. Had Kelner recanted the threat after it was made but before the broadcast, he would have been powerless to prevent transmission and therefore powerless to prevent the crime charged here. Thus Kelner was in a position unlike other defendants prosecuted under this statute, each of whom had control over the threat until it was transmitted in interstate commerce either by mailing the letter or placing the phone call.

This case, conceded to be one of first impression, deals with the broadcast media which have First Amendment rights separate and apart from Kelner's and which do not apply to telephone company employees or postmen. If WPIX had reported the story by using silent film but quoting Kelner, or in any manner other than sound film, would the transmission of a communication of a threat have taken place within the meaning of the statute? Would there have been a violation if instead of a television newsman, a reporter for a newspaper which is mailed interstate had asked the question and then written a story with a quotation of the threat?

While I concur in the disposition of this appeal, I believe that its precedential value should be severely restricted. I am apprehensive about the implications of considering the broadcast media to be modes of communication in threat cases. It is obvious from the legislative history that Congress had not considered this eventuality; I can only hope that Congress will clarify its intention as to the scope of this statute.