SMITH, Judge.
An Escambia County jury found that appellants Matthews and Brooks committed extortion by verbal threats of bodily injury, *644 in violation of § 836.05, F.S.,[1] while leading nighttime demonstrations in February 1975 at the Escambia County jail in Pensacola. Over a period of more than three weeks, up to 200 black demonstrators protested the shooting of a young black man by deputy sheriff Doug Raines. A grand jury found the killing justifiably committed in self-defense, but the demonstrators excoriated Raines as a murderer and demanded his dismissal from the force. They also sought such concessions as more black deputies and matrons and “more black justice throughout the county.”
Acknowledging their purpose to secure Raines’ dismissal, appellants insist that the First Amendment entitled them to so petition or demand by mass chants, prayers, pickets, songs, parades, and other forms of pure and symbolic speech. They urge reversal of their convictions[2] for lack of a sufficient showing that their chanted allusions to “assassination”[3] of the sheriff and other uncooperative public officials constituted, in law, a “threat . . . calculated to coerce the victim to meet the demands of the extortioner in order to prevent the threat from being carried out.” State v. McInnes, 153 So.2d 854, 858 (Fla.App. 1st, 1963).
The information charges that Matthews and Brooks “did verbally and maliciously threaten injury” to sheriff Untreiner, deputy Raines and numerous other deputies in order to compel the sheriff’s acquiescence in their demands for Raines’ dismissal. At the heart of the State’s case is the demonstrators’ vituperative chant which, given the ominous literal interpretation invoked by the State, threatens not mere “injury” but death to Governor Askew in addition to the others named:
“Two, four, six, eight, who shall we assassinate?
Doug Raines, Doug Raines, Sheriff Un-treiner, Askew, and the whole bunch of you pigs.”
There was evidence that appellant Matthews led the chant with a bullhorn and that appellant Brooks joined in.
We will not jeopardize Florida’s extortion statute by reading its proscription of verbal and written threats so broadly that it offends the First and Fourteenth Amendments. The Supreme Court in Waits v. United States, 394 U.S. 705, 707-08, 89 S.Ct. 1399, 1401-02, 22 L.Ed.2d 664, 667 (1969), construing the federal statute proscribing threats of bodily harm to the President, held that “political hyperbole,” though “vituperative, abusive, and inexact,” cannot constitutionally be confused with and prosecuted as a criminal “threat”:
“[A] statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.”
Watts did not decide whether, in light of the First «Amendment, the federal statute requires proof of the accused’s actual intent “to carry out his ‘threat’ ” or if it is satisfied by proof of his “apparent determination.” [4] But, the Supreme Court held, only *645 “a true ‘threat’ ” may be the subject of criminal prosecution.[5] Our Court’s decision in Mclnnes, that a demand and threat actionable under the Florida statute must be calculated to coerce the victim’s acquiescence “in order to prevent the threat from being carried out,”[6] seems to be in harmony with Watts' constitutional restriction of prosecution to “real” threats.
Appellants’ argument is that the chanted allusion to assassination of the deputy, the sheriff, the governor “and the whole bunch of you pigs” was on its face and in this context a privileged “public harangue, of a political nature,” as was the mock “threat” held privileged in Watts.[7] United States v. Quinn, 514 F.2d 1250, 1268 (5th Cir. 1975). Shocking and offensive as the words were, especially as delivered in cheering cadence by a substantial number of the crowd approaching 200, appellants urge that the “pep rally” style of delivery, the laughter that punctuated the chant,[8] and the improbability of the message itself leave a reasonable doubt that appellants calculated their words to induce all Escambia County lawmen to capitulate rather than be killed along with the governor.
Appellants are correct in urging that the context of the chant and the mood and reaction of the crowd are to be taken into account in coloring the words spoken. Waits, 394 U.S. at 708, 89 S.Ct. at 1402, 22 L.Ed.2d at 667. But, if surrounding circumstances are thus to be gleaned for facts casting an innocent light on the critical words, we must also deal with evidence of graver significance.
Appellants’ offense allegedly was committed on the night of February 21, after more than three weeks of frequent demonstrations of various kinds and several nightly gatherings at the jail. Until the 19th, one deputy testified, the nighttime gatherings were noisy but good-humored “pep rally” affairs. Then, the mood of the crowd began to become “more hostile, frightening.” On the 21st, he testified,
“. . . the crowds’ chant lost the cheerfulness tone, so to speak, and became, to me, very serious, very threatening.”
He considered that the demonstrations were “peaceful” until the 21st, “but when they came with the weapons, it changed the whole atmosphere.”
The weapons referred to were sometimes concealed beneath coats and sometimes openly exhibited by members of the crowd. Plainly visible in the front row of the crowd were several sticks or clubs, held by demonstrators in one hand and slapped in the palm of the other under the noses of deputies on the scene. A steak knife was seen being passed from one demonstrator to another. Umbrellas with pointed tips and a golf club shaft, head removed, were exhibited. And, as the “assassination” chant was delivered, members of the crowd “turned around and pointed their fingers at us,” said one of the deputies guarding the jail and monitoring the demonstration. Two officers were spat upon by unknown members of the crowd. These acts done in appellants’ presence reveal a menacing intention by at least some of the “assassination” chanters.
It would surely be improper, as appellants argue, to inculpate them for association with a few menacing individuals in a crowd of 200, or to assume by transference *646 that appellants’ purposes were those of the most malevolent person there. Absent independent proof that appellants adopted as their own thd object of enforcing demands by “real” threats which were calculated to overcome the sheriff’s will by fear, this is no place for application of the doctrine that “all the acts and declarations of the members of a conspiracy constitute the acts and declarations of, and are therefore admissible against, each of them.” Resnick v. State, 287 So.2d 24, 25 (Fla.1974). However, because the appellants led the crowd which was responsively arrayed before them, acts and attitudes of members of the crowd may be considered in ascertaining the meaning of the collective chant. The question is: To what meaning did appellants subscribe?
The evidence of appellant Matthews’ purpose to induce fear goes beyond merely leading the chant. On the 21st, he made certain the point was brought home to sergeant Edison by turning to him at the end of the “assassination” chant and saying, “That goes for you too.” Using the bullhorn, he also “directed the crowd” to deputy Cardwell and announced, “Boy, we’ll eliminate you too, if you don’t straighten up.” This, taken with evidence of his dominant position before the massed demonstrators, some of whom brandished crude weapons, could properly have convinced the jury that Matthews consciously embraced fear of bodily injury as an instrument of enforcing otherwise lawful demands. Consequently, the evidence was sufficient to convict him of extortion.
Not so as to appellant Brooks, who was not heard to express any individual threat, who was not continually present, who did not entirely share Matthews’ leadership in directing the “assassination” chant, and who took pains to keep passage open for essential jail traffic. The jury could not properly have concluded, beyond a reasonable doubt, that appellant Brooks’ participation in the demonstration exceeded the bounds of permissible expression protected by the First and Fourteenth Amendments.
We have considered all of appellant Matthews’ points, including his assertion that the trial court erred in admitting evidence of anonymous telephone threats. While it was improper to admit proof of such acts by presumed but unknown “co-conspirators” who were outside Matthews’ presence, Matthews’ trial counsel, who was later replaced, did not object. Admission of the evidence was not fundamental error requiring reversal in the absence of objection. Matthews’ other arguments do not persuade us.
REVERSED as to Brooks, AFFIRMED as to Matthews.
MILLS, Acting C. J., and CAWTHON, VICTOR M., Associate Judge, concur.

. Section 836.05 provides: “Whoever, either verbally or by a written or printed communication, maliciously threatens ... an injury to the person, property or reputation of another, .. . with intent thereby ... to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his will, shall be guilty of a felony of the second degree . .

. Appellant Matthews was sentenced to imprisonment for five years. Appellant Brooks was placed on five years’ probation “on condition you not conduct or participate in any public demonstrations in the State of Florida or elsewhere.” The condition of Brooks’ probation appears to be an impermissibly overbroad restraint on a form of protected speech. See, e. g., Porth v. Templar, 453 F.2d 330, 334 (10th Cir. 1971).

. Some evidence, including testimony by one deputy, tended to show that the “threat” was not to “assassinate” but to “incaserate” or “incarcerate.” There was evidence also that some demonstrators varied the verb to “castrate.” The jury’s verdict binds us to the “assassination” version urged by the State.

. The majority in Watts professed to have “grave doubts” that a conviction could be had on proof of only an apparent determination to *645 carry out the threat. 394 U.S. at 707-08, 89 S.Ct. at 1401, 11 L.Ed.2d at 667. A divided panel of the Court of Appeals had held, in an opinion by Judge Burger, that actual intent to execute the threat is not an element. Watts v. United States, 131 U.S.App.D.C. 125, 402 F.2d 676 (1968).

. 394 U.S. at 708, 89 S.Ct. at 1401, 11 L.Ed.2d at 667.

. 153 So.2d at 858.

. Watts’ words, delivered in protest of his conscription during the Vietnam conflict, were: “I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.” 394 U.S. at 706, 89 S.Ct. at 1401, 22 L.Ed. at 666.

. We have listened to the tape recording of the demonstration of February 20, introduced in evidence by the State.