363 So.2d 1066 (1978)
Hawthorne Konrad MATTHEWS, Appellant,
v.
STATE of Florida, Appellee.
No. 50350.
Supreme Court of Florida.
July 27, 1978.
Rehearing Denied November 28, 1978.
*1067 Paul Shimek, Jr., of Shimek & Sutherland, Pensacola, for appellant.
Robert L. Shevin, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., Tallahassee, for appellee.
SUNDBERG, Justice.
This cause comes to us by appeal from the decision of the District Court of Appeal, First District, in Matthews v. State, reported at 336 So.2d 643, because the district court initially and directly passed on the validity of Section 836.05 Florida Statutes (1973), thereby vesting jurisdiction in this Court under Article V, Section 3(b)(1), Florida Constitution. It is unusual that the case would reach this Court in this posture. Ordinarily, the initial ruling upon the constitutionality of the statute would take place in the trial court in which event direct review in this Court would follow. Article V, Section 3(b)(1), Florida Constitution. If a ruling on the validity of the statute was not made in the trial court, it is difficult to understand how it was preserved for review in the District Court of Appeal. Nonetheless, the assignments of error filed by the appellant in the court below clearly raise the constitutional issue:
Florida Statute § 836.05, the section under which the Defendant has been convicted, is unconstitutional as applied to your Defendant based upon the facts in this cause and is in contravention as applied *1068 in this cause to Defendant's rights under the First Amendment, Fifth Amendment, and Fourteenth Amendment to the Constitution of the United States of America. The conviction is an unconstitutional application of the extortion statute, i.e., § 836.05.
Appellee State does not cross-appeal in this Court asserting that the matter was not preserved at the trial court level. Consequently, when the district court affirmed appellant's conviction in the face of this constitutional challenge, it inherently ruled on the validity of the statute. Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Air Authority, 111 So.2d 439 (Fla. 1959). The fact that appellant does not challenge the facial validity of the statute but instead contests the constitutionality of the statute as applied to his conduct does not preclude review by this Court. Snedeker v. Vernmar, Ltd., 151 So.2d 439 (Fla. 1963).
The facts of the case sub judice are as follows: On December 20, 1974, a young black man was shot and killed by a deputy sheriff in Escambia County. The shooting became the subject matter of a grand jury investigation which resulted in a finding that the deputy fired in self-defense. Appellant and other members of the black community staged several demonstrations in protest. Among other things, the demonstrators demanded the removal of the deputy from office. At one of these demonstrations, appellant led the crowd in the following chant:
Two, four, six, eight, who shall we assassinate? Doug Raines, Doug Raines, Sheriff Untreiner, Askew, and the whole bunch of you pigs.[1]
Appellant was arrested and charged with extortion, a violation of Section 836.05, Florida Statutes (1973),[2] in that he verbally and maliciously threatened injury to Sheriff Untreiner in order to compel the dismissal of Deputy Raines. Appellant was found guilty by a jury and sentenced to five years in prison. On appeal, the District Court of Appeal, First District, affirmed the judgment and the sentence, interpreting the decision of the Supreme Court in Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), to suggest such result. We affirm.
In Watts v. United States, supra, the United States Supreme Court had the opportunity to construe the federal statute[3] proscribing threats of bodily harm to the President. Defendant, while participating in a political debate at a small public gathering which followed a demonstration held at the Washington Monument, expressed an intention to resist induction into the armed forces and allegedly stated that, "if they ever make me carry a rifle the first person I want in my sights is L.B.J." On the basis of those facts, defendant was convicted in a jury trial of knowingly and willfully threatening the life of the President. After the United States Court of Appeals for the District of Columbia Circuit affirmed the conviction, the Supreme Court granted certiorari and reversed. The Court stated that a "true threat" must be distinguished from conduct protected by the First Amendment.
We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose "against the background of a profound *1069 national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise. (Citations omitted)

Id. at 708, 89 S.Ct. at 1401.
In the instant case, the District Court of Appeal, First District, speaking through Judge Smith, carefully analyzed the evidence presented by the record and concluded that the appellant's conduct constituted a real and substantial criminal "threat" as opposed to "political hyperbole." While conceding that Watts requires the context of the chant and the mood and reaction of the crowd to be taken into account in coloring the words spoken, the district court looked not only to the exculpatory circumstances surrounding the event urged by appellant but also considered evidence in the record "of graver significance." This evidence included testimony that on the night appellant's offense was allegedly committed, (i) the mood of the crowd (which theretofore had been good-natured) became "more hostile, frightening;" (ii) the demonstrators possessed sticks and clubs which they held "in one hand and slapped in the palm of the other under the noses of deputies on the scene;" (iii) the crowd passed a steak knife from one demonstrator to another, and at the same time, exhibited umbrellas with pointed tips and a golf club shaft with the head removed; (iv) the appellant at the end of the "assassination" chant stated directly to Sergeant Edison "that goes for you too;" and (v) the demonstrators spat upon two police officers. The district court concluded that the totality of the evidence "could properly have convinced the jury that Matthews consciously embraced fear of bodily injury as an instrument of enforcing otherwise lawful demands." Such a result is not proscribed by Watts, supra, and is consistent with State v. McInnes, 153 So.2d 854 (Fla. 1st DCA 1963), which concluded that in order for a demand and threat to be actionable under our extortion statute, it must be calculated to coerce the victim's acquiescence "in order to prevent the threat from being carried out."
If there is competent evidence in the record before the District Court of Appeal, First District, to support its conclusion, and if that court does not misapply the correct rule of law, its decision must be affirmed. Shaw v. Shaw, 334 So.2d 13 (Fla. 1976). In the case sub judice, there exists evidence in the record to support the conclusion of the District Court of Appeal, First District, that the statute was not unconstitutionally applied to appellant. Furthermore, it is apparent that the District Court neither failed to consider nor misapplied the Watts decision. Under such circumstances it transcends the scope of our review to substitute our judgment for that of the jury, the trial judge and the District Court of Appeal, First District, and to determine upon our view of the same evidence in the record that the statute was unconstitutional as applied to appellant.
Accordingly, the decision of the District Court of Appeal, First District, is affirmed.
It is so ordered.
ENGLAND, C.J., and ADKINS and OVERTON, JJ., concur.
BOYD, J., dissents with an opinion.
HATCHETT, J., dissents with an opinion.
BOYD, Justice, dissenting.
In Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), in order to consider compelling First Amendment claims the United States Supreme Court reviewed the evidence in a conviction for knowingly making a threat to do bodily *1070 harm to the President. It reversed the conviction because it punished speech protected by the First Amendment. Watts made a threat to shoot the President at a time of great national tension over the Viet Nam War. The threat was made to a group at a public rally on grounds of the Washington Monument, not far from the White House. A President had been assassinated in the recent past. If Watts' statement is protected speech then I cannot see how the "2-4-6-8" chant at a public gathering to protest what the demonstrator's felt was government wrongdoing is anything other than protected speech. Regardless of personal views of the anti-social content of the expression for which Reverend Matthews is being punished, I am bound to follow the precedent set by the United States Supreme Court. I am constrained to dissent.
HATCHETT, Justice, dissenting.
Was the "assassination" cheer voiced by Reverend Matthews and other demonstrators directed to inciting, threatening, or producing imminent violence against Sheriff Untreiner, Deputy Doug Raines, Governor Askew, and others? Were these cheers likely to incite or produce such lawless action? The majority opinion of this court and the opinion of the district court failed to address these two critical questions. Clearly, the evidence in the record is insufficient to support affirmative conclusions on these two issues. By upholding Reverend Matthews' conviction of extortion, and by failing to narrowly construe Florida's extortion statute, the majority violates the two-pronged test set forth by the United States Supreme Court in Brandenburg v. Ohio, 395 U.S. 444, 447-448, 89 S.Ct. 1827, 1829-1830, 23 L.Ed.2d 430 (1969), (unanimous per curiam opinion), which held that:
... the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action ... A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control.[1]
*1071 Until this court places such a limiting construction upon our extortion statute, especially as applied to political statements on public issues, the statute will remain overly broad and invalid on its face.
On December 20, 1974, a young black man was shot and killed by Deputy Sheriff Douglas Raines in Escambia County. A local grand jury investigation determined the homicide was justified. Members of the local black community were outraged over this tragedy, and they began to conduct nightly meetings in two local churches. After these meetings, marches were made to various downtown locations or to the county jail. "Human relations meetings" between public officials and local black leaders failed to produce any agreement since the sheriff was adamant in his refusal to fire the deputy who had committed the homicide, and the black community was equally steadfast in its determination to have this deputy removed from the sheriff's force. Commencing January 24, demonstrations were held nightly at the county jail, culminating in the arrest of Reverend Matthews and one other leader on February 24. The trial transcript contains extensive testimony concerning the various events surrounding this conflict since the trial court admitted, over objections, all testimony relating to general "agitation" on the grounds that it was part of a general pattern to intimidate the sheriff into conceding to the protestors' demands. Sergeant Jim Edson, the S.W.A.T. commander, in charge of crowd control during these protests, testified that the demonstrators made demands for the removal of Deputy Raines, for the removal of Sheriff Untreiner, for more black deputies, and for more black staff at the county jail. Members of the protest group carried cards bearing slogans such as "Do away with Douglas Raines," and "Douglas Raines is a murderer." Each day the number of demonstrators at the nightly protest meetings outside the county jail increased. On February 19, approximately 140 to 150 demonstrators were present; by the 21st, the crowd had increased to 160 or 175 persons; on the night before the arrest, more than 200 demonstrators were present at the police station. Sergeant Edson testified that by February 19, he noticed a change in the crowd from the initial days of the protests:
The crowds seems to increase, the tempo increased, the vocal tones got louder and louder, the demands became more so to where they included more persons than Doug Raines and Sheriff Untreiner at that time.
Sergeant Edson further testified that on February 19, he heard a new cheer, which was ultimately used by the police as a basis for the arrest and conviction of Reverend Matthews for extortion:
Two, four, six, eight, who shall we assassinate, Doug Raines, Sheriff Untreiner, Askew, and the whole bunch of you pigs.
At the end of the cheer, the demonstrators pointed their fingers at all the law enforcement officers present. The officers heard this cheer repeated on the 20th, the 21st, the 23rd, and the 24th of February. On the 20th of February, Sergeant Edson advised the sheriff of this "assassination" cheer and instructed other officers to do legal research and consult with the state attorney because the sergeant believed there must be "some law covering this type of vocal threat to do somebody bodily harm." On February 21, the police made tape recordings of approximately 40 minutes of cheering, speeches, singing, and praying by the demonstrators at the county jail  including the "assassination" cheer. The officers testified that the crowd made this cheer "in unison ... just like singing a song, a choir." This cheer was only one of several cheers repeated each evening by the demonstrators. Others chanted by the crowd included: "We're gonna stop, stop the racist cops" and "Ain't gonna let nobody turn me round, turn me round, turn me round, ain't gonna let nobody turn me round. Gonna keep on walking, keep on walking, walking on the freedom way."
The majority opinion agrees with the state's theory that appellant, by leading the "assassination" cheers, unlawfully communicated a threat in order to compel the sheriff to do an act against his will, i.e., *1072 dismiss Deputy Raines.[2] The state emphasized that during the course of these demonstrations, the officers observed weapons among the crowd. The S.W.A.T. team commander testified to the presence of these weapons, stating:
On the 19th and a couple days prior to that ... we viewed clubs approximately 22 to 24 inches long on the front row immediately facing us and slapping them in their hands. We viewed a steak knife coming out of a ladies purse and being passed to a black male. We saw two or three with sticks in the back of the crowd, one with a cut-off golf club ... We seen umbrellas that were pointed at the spiral.
The officers, however, made no arrests of the demonstrators for possession of weapons. Sergeant Edson stated that his orders were to try not to provoke the situation, but to keep the demonstrations peaceful and try to keep an entrance open to the jail. No firearms were present. This absence of any firearms among the demonstrators is significant.[3] Further, the officers in charge of crowd control were themselves armed only with aluminum batons. Although the "assassination" cheer had been repeated each evening starting on the 19th of February, no action was taken by the sheriff until February 24. Sheriff Untreiner testified to his reasons for authorizing the arrests:
On Sunday night, February the 23rd, they marched again, and this was one of the biggest, and the next morning, Monday, Sergeant Edson came to me, and he said that they had repeated the chants, threatening me and the governor and Raines, that they had blocked our cruiser cars so that they couldn't get in or out on business. And I said, "well, it's time to go see the state attorney, Curtis Golden."
The sheriff was asked, while a witness at trial, about the alleged extortion threats, and whether he, in his 22 years experience as an FBI agent, had ever in his investigation of cases had a person make a threat against somebody else in that fashion. The sheriff answered, "No, sir. It was a strange way to make one."[4]
The district court and the majority opinion of this court conclude that there was sufficient evidence for the jury to find that Matthews "consciously embraced fear of bodily injury as an instrument of enforcing otherwise lawful demands." (emphasis added) This result, the court stated, is consistent with the previous construction of the extortion statute in State v. McInnes, 153 So.2d 854 (Fla. 1st DCA 1963), which determined that in order for a demand and threat to be actionable under our extortion statute, it must be calculated to coerce the victim's acquiescence "in order to prevent the threat from being carried out."[5]
Contrary to the determination by the majority, this construction of our extortion statute is inconsistent with Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), as explained by subsequent Supreme Court decisions, such as Brandenburg, which outlined the extent to which a state may outlaw the advocacy of violence. In Brandenburg, the defendant, a leader of a Ku Klux Klan group, was convicted under an Ohio syndicalism statute for advocating the duty, necessity, propriety of crime, sabotage, violence, or other unlawful methods of terrorism as a means *1073 of accomplishing industrial or political reforms. In that case, the KKK held a meeting during which the members carried firearms, burned a cross, and made various derogatory statements against Blacks and Jews. In addition, the convicted leader gave a speech in which he stated that the members were going to march on Washington and other cities:
If our President; Congress, our Supreme Court continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken. Brandenburg, 395 U.S. at 446, 89 S.Ct. at 1829.
The United States Supreme Court, in that case, held the Ohio statute to be unconstitutionally broad because it was not narrowly construed to proscribe only that advocacy of violence directed to inciting or producing imminent lawless action, and likely to incite or produce such action. This is the test to be applied in this case.[6] The subsequent decision in Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), further explains what the Court meant by "advocacy is directed to inciting or producing imminent lawless action." In that case, police officers were moving to clear a street filled with demonstrators. The demonstrators in their path moved to the curbs on either side, and Hess shouted at the police officers, "We'll take the fucking street again." He was arrested for disorderly conduct. The U.S. Supreme Court stated that Indiana's disorderly conduct statute was applied in that case to punish only spoken words. Contrary to the Indiana Supreme Court's determination that this statement "... was intended to incite further lawless action on the part of the crowd in the vicinity ... and was likely to produce such action," the U.S. Supreme Court stated that, at worst, it amounted to nothing more than advocacy of possible illegal action at some indefinite time. Hess, 414 U.S. at 108, 94 S.Ct. 326. Citing Brandenburg, the Court held that since the words were not intended nor were likely to produce imminent disorder, the words could not be punished by the state on the grounds that they had a "tendency to lead to violence." Hess, 414 U.S. at 109, 94 S.Ct. 326. The decision in Watts should be read in conjunction with these and other cases which delineate what forms of speech may be punished as criminal.[7] The U.S. Supreme Court in Watts did not require proof of a specific intent to carry out the threats made. However, proof of a "true threat" is necessary. This constitutionally-limited definition of the term "threat" was set forth to insure that only unequivocal, unconditional, immediate, and specific threats are punishable. In other words, the First Amendment does not protect verbal threats which convey a gravity of purpose and imminent prospect of execution. See, United States v. Kelner, 534 F.2d 1020 (2nd Cir.1976).[8]
*1074 In this case, the information charging Matthews did not restrict the application of the extortion statute in the manner consistent with Brandenburg and Watts.[9] In addition, the trial court failed to instruct the jury according to these principles.[10] The district court also failed to apply the proper legal tests to the facts of this case. Clearly, under the facts presented at trial, the "assassination" cheer was not a "true threat" since it was not directed to inciting, threatening, or producing imminent lawless action, nor was it likely to incite or produce such action. The state should have been required to prove that the sheriff reasonably feared imminent violence against his life if he did not concede to the protestors' demands. The alleged "threat" was not unequivocal, unconditional, immediate, and specific, nor was it made in a manner and context which conveyed a gravity of purpose and imminent prospect of execution. Reverend Matthews did not urge the crowd to take up weapons and kill local police officers. Taking the facts in the worst light, the demonstrators were vocally expressing, by means of this cheer, their belief that Sheriff Untreiner and others deserved to be assassinated, in revenge for the killing of a local black citizen by a deputy sheriff. This is insufficient to make their spoken words actionable. Although fears existed in the community because of racial tensions, it is clear that the police officers did not believe that the cheers were threats of imminent violence. No arrests were made until five days after the "assassination" cheers began. Rather, the record implies that the police merely used these spoken words in order to arrest the leaders of the *1075 demonstration on charges more serious than the misdemeanor of disorderly conduct.[11] Although the demonstrators were militant in their determination to achieve their demands, it is unreasonable to suggest that the "assassination" cheers were serious threats or incitements to kill the sheriff, his deputy, and the governor. Viewed in a realistic sense, the cheer was the type of "political hyperbole" discussed in Watts. The record reflects the greatest fear on the part of the sheriff was the growing size of each night's demonstration, and the greater effectiveness that such demonstrations were having on the operations of the sheriff's office and the community. Such civil disobedience might have been sufficient to have subjected the demonstrators to other criminal charges for disorderly conduct or trespassing. The serious extortion charges against appellant, however, punish the spoken words of the demonstrators, rather than their possibly disruptive conduct.
General threats to assassinate or incarcerate public officials, unless certain political changes are made, may be a distasteful, counterproductive, and unwise manner of voicing political demands. Such words, however, are not actionable unless they are directed towards inciting or threatening imminent lawless action, and, in addition, are stated in a manner and circumstance which raise reasonable fears as to the likelihood of their execution. There is insufficient evidence in the record to support any conclusion that the cheers of the demonstrators went beyond speech protected by the First Amendment.
Political disputes often involve exaggerated statements of intent, such as those involved in Watts and in the present case. Our country has traditionally committed itself to the principle that debate on public issues should be uninhibited, robust, and wideopen, in that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. See, New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact. Watts, 394 U.S. at 708, 89 S.Ct. 1399. However, "the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate, or sooner or later they will be denied to the ideas we cherish."[12] The protections of the First Amendment encompass all of our citizens, whether black militants or Ku Klux Klan members. Only by allowing our citizens to voice their political opposition to the fullest extent possible can we encourage the use of the open political forum and inhibit the growing tendency of clandestine violent attacks as a means of political change. Since the construction placed upon our extortion statute allows the prosecution of protected speech, as evidenced by the record in this case, I must respectfully dissent.
NOTES
[1] As pointed out in the opinion of the district court there was conflicting evidence as to whether the precise word "assassinate" was used by the demonstrators, but the jury's verdict binds a reviewing court to the "assassination" version of the chant urged by the State.
[2] § 836.05, Fla. Stat. (1973), states:

"Threats; extortion.  Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his will, shall be guilty of a felony of the second degree, punishable as provided in § 775.082, § 775.083, or § 775.084."
[3] 18 U.S.C. § 871(a) (1964).
[1] The Supreme Court, in Brandenburg, expressly overruled Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), which had permitted prosecution for the verbal advocacy of terrorism as a method of political reform, without requiring proof of imminent danger of violence. The "clear and present danger" rule, as applied in Whitney and similar decisions, was discarded in favor of the more restrictive version of the test set forth in Brandenburg. The serious questions concerning the application of the "clear and present danger" test which were articulated in the concurring opinion of Justices Brandeis and Holmes apparently formed the basis for the more restrictive criteria announced over 40 years later in Brandenburg:

This Court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present; and what degree of evil shall be deemed sufficiently substantial to justify resort to abridgement of free speech and assembly as the means of protection... . Whitney, 274 U.S. at 374, 47 S.Ct. 641.
Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one... . But even advocacy of [law] violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated. Whitney, 274 U.S. at 376, 47 S.Ct. 641, 648.
[2] The Affidavit of Complaint stated:

"... On the night of February 21st, 1975, Hawthorne Konrad Matthews did, on the steps of the county jail, lead a chant which included the words, `Two-Four-Six-Eight, who we gonna assassinate, Untriener (sic), Raines, and the whole damn bunch,' this unless Deputy Douglas Raines was fired or suspended from the sheriff's office."
[3] There is only one mention in the record of a firearm being possessed by a member of the protest group. One deputy observed a man standing guard outside of a local church, where a protest meeting was being held, with a shotgun in his arms.
[4] The manner in which the alleged threats were publicly announced and the political nature of the demands sought by the demonstrators emphasize the misapplication of the extortion statute by the majority opinion.
[5] McInnes involved a threat communicated in secret to the victim, demanding payment of money in order to prevent the threat from being executed.
[6] The Court in Brandenburg further noted that statutes affecting the right of assembly, like those touching on freedom of speech, must observe this distinction between mere advocacy and incitement to imminent lawless action.
[7] See our recent decisions in Spears v. State, 337 So.2d 977 (Fla. 1976) (public use of obscene language); State v. Saunders, 339 So.2d 641 (Fla. 1976) (breach of peace); State v. Simpson, 347 So.2d 414 (Fla. 1977); McCall v. State, 354 So.2d 869 (Fla. 1978) (insulting a teacher at school); Brown v. State, 358 So.2d 16 (Fla. 1978), Case no. 50,559, (open profanity) in which we construed or held unconstitutional state statutes in a manner consistent with the requirements of the First Amendment. As noted in New York Times Co. v. Sullivan, 376 U.S. at 269, 84 S.Ct. 710, 11 L.Ed.2d 686, regardless of the "label," no state action is immune from those constitutional limitations. In Spears, supra, 337 So.2d at 980, we noted that special rules apply in cases where a statute makes speech punishable as a crime. The government may regulate in this area only with narrow specificity, and such statutes can withstand constitutional attack only if they are not susceptible of application to protected expression. In the above cited cases, we recognized that those statutes must be construed to apply only to that constitutionally unprotected class of words  fighting words,  which by their very utterance inflict injury or tend to incite an immediate breach of the peace. The terms "fighting words" and "true threat" are founded upon similar requirements, i.e., proof that there is a reasonable likelihood of imminent harm.
[8] The opinion in Kelner, supra, 534 F.2d at 1027, concluded that the:

... requirement of proof of a "true threat" ... works ultimately to much the same purpose and effect as would a requirement of proof of specific intent to execute the threat because both requirements focus on threats which are so unambiguous and have such immediacy that they convincingly express an intention of being carried out.
The facts in Kelner present a good example, in contrast to the present case, of a threat which does not constitute protected political expression. There, a leader of the Jewish Defense League, dressed in military uniform and armed with a gun, stated in serious, unequivocal, and unconditional language that his group was planning to assassinate Palestinian leader Yasser Arafat, who was visiting this country. Kelner stated that:
We have people who have been trained and who are out now and who intend to make sure Arafat and his lieutenants do not leave this country alive ... Everything is planned in detail ... United States v. Kelner, 534 F.2d at 1021.
[9] The charging information stated:

BILLIE JOE BROOKS, SR., AND HAWTHORNE KONRAD MATTHEWS on/or about the 21st day of February, in the Year of Our Lord, One Thousand, Nine Hundred and seventy-five at and in Escambia County, Florida did verbally and maliciously threaten injury to the persons of Sheriff Royal E. Untreiner, Deputy Sheriff Doug Raines and numerous other Deputy Sheriffs, with intent thereby to compel the persons so threatened to do an act against their will, to-wit: to compel the suspension or resignation of Deputy Sheriff Doug Raines against the will of Sheriff Royal E. Untreiner and against the will of Deputy Sheriff Doug Raines, contrary to section 836.05, Florida Statutes.
[10] The fact that appellant did not object to the trial court's instructions is immaterial, see Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). This court has accepted jurisdiction to review this case to determine whether the extortion statute is unconstitutionally broad because it encompasses within its proscription speech protected by the First and Fourteenth Amendments. It appears from the majority opinion that this court has improperly restricted its review of this case to the question of whether there is competent evidence in the record to support the conclusions of the district court, and whether that court applied the correct rule of law. To the contrary, our appellate review of this case should determine whether the facts presented in the record could constitutionally support a conviction, in addition to the separate question as to the constitutional validity of the statute. The United States Supreme Court has stated that, in cases involving alleged First Amendment violations, it would make an independent examination of the whole record, to assure itself that the judgment does not constitute a forbidden intrusion on the field of free expression. Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697. In New York Times Co. v. Sullivan, 376 U.S. 285, 84 S.Ct. 710, 11 L.Ed.2d 686, the Court reiterated this principle of review stating that it was not limited merely to an elaboration of constitutional principles but also to a review of the evidence to make certain that those principles have been constitutionally applied. Pursuant to our direct appellate review of this case, we should assume no lesser duty.
[11] It is significant that the district court reversed the conviction of co-defendant Brooks, in spite of its conclusion that there was enough evidence to support the jury's determination that Brooks had also participated in the same "assassination" cheer. If the cheer had conveyed an unambiguous threat of imminent harm to Sheriff Untreiner and Deputy Raines, then all those voicing such a "true threat" could be punished. Brooks' secondary leadership role and his efforts to keep the demonstration peaceful would be irrelevant as a defense to prosecution for his voicing a true criminal threat. See, Matthews v. State, 336 So.2d 643, 646 (Fla. 1st DCA 1976).
[12] Quoted from the dissenting opinion from Justice Hugo Black, in Communist Party v. S.A.C.B., 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625 (1961), cited with approval in Healy v. James, 408 U.S. 169, 188, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).