**[J-83-2017] [MO:Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 WAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered August 2, 2016 at No. |
| | : | 1136 WDA 2014, affirming the Order |
| v. | : | of the Court of Common Pleas of |
| | : | Allegheny County entered February |
| | : | 21, 2014 at Nos. CP-02-CR-0006621- |
| JAMAL KNOX, | : | 2012, CP-02-CR-0003870-2013, CP- |
| | : | 02-CR-0004264-2013. |
| Appellant | : | |
| | : | ARGUED:  November 28, 2017 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                          **DECIDED:  AUGUST 21, 2018**

I agree with much of the learned Majority's opinion.  For instance, I concur in the Majority's general explication of First Amendment principles in the true threat context. Specifically, I agree that one result of the United States Supreme Court's fractured decision in *Virginia v. Black*, 538 U.S. 343 (2003), is that our previously-applied objective, reasonable-listener standard for assessing whether a statement was, in fact, a constitutionally sanctionable true threat is "no longer viable."  Maj. Op. at 16.  The Majority correctly interprets *Black* and its progeny to require, as part of a dual-pronged analysis, an assessment of the speaker's subjective intent.  Finally, I agree with the Majority that the facts of this case demonstrate that Jamal Knox intended to communicate a true threat via the lyrics of the contested rap song.  Hence, I join the Majority in affirming Knox' criminal convictions.

However, I do not agree with the limited test articulated and applied by the Majority. The Majority distills the relevant jurisprudence into two general "facets:" (1) the First Amendment "allows" states to criminalize speech when it is "specifically intended" to terrorize or intimidate; and (2) "evidentiary weight should be given to contextual circumstances" surrounding the statement.[1] Maj. Op. at 18. My primary disagreement lies with- the unnecessary restraint employed by the Majority in articulating the first prong of this test. The Majority correctly concludes that the First Amendment *permits* imposing punitive actions upon a person who specifically intends to communicate a true threat. But the Majority refuses to consider the more important question of whether the First Amendment *requires* proof of specific intent, or whether the Amendment would tolerate punishment of speech based upon proof of only a lesser *mens rea* such as recklessness or knowledge. *Id.* at 17-18 n.10. The Majority accurately notes that this latter inquiry is an "open question." *Id.* I would answer that question in this case.

As a general jurisprudential matter, the Majority's restrained approach is not without merit. Nonetheless, there are compelling reasons to resolve this issue presently. First, Knox places squarely before this Court the question of whether specific intent is a necessary and essential element to a true threats analysis. Second, and perhaps more importantly, our current framework predates the United States Supreme Court's decisions in *Black* and *Elonis v. United States*, ___ U.S. ___, 135 S. Ct. 2001 (2015). Following *Black* in particular, the United States Courts of Appeals have been compelled to decide if, and how, *Black* affected their preexisting true threats analyses, and whether *Black*

---

[1] The contextual circumstances referred to by the Majority derive from the United States Supreme Court's seminal true threats case, *Watts v. United States*, 394 U.S. 705 (1969) (*per curiam*). In that case, the Supreme Court held that Watts' statement was not a true threat, *inter alia*, because it was uttered during a political rally, because the statement was conditional, and because those who heard the statement did not take it seriously. *Id.* at 708.

required proof of subjective intent. Most circuits have held that *Black* does not require such proof. Regardless of the outcome, those decisions underscore the necessity of interpreting *Black* and ascertaining its impact upon a true threats analysis. We must undertake a similar analysis, not only because we are asked to do so, but also because our current test clearly is outdated and presently insufficient, in large part because we crafted it in *J.S. ex. rel. H.S. v. Bethlehem Area School District.*, 807 A.2d 847 (Pa. 2002), which predated the United States Supreme Court's most recent guidance in this area of federal constitutional law. Because it is imperative that we reconsider and modify our true threats test, we should construct a complete and final test, not a partial one that leaves uncertainty that will serve only to complicate and protract litigation in future cases.

Finally, and perhaps most importantly, declining to resolve the legal question presented in full would ignore the real and precedential effect of our decisions. Although we are deciding a First Amendment issue that arose in a criminal case, the framework that we are called upon to update and revise will not be so confined. The Majority's limited decision does not provide sufficient guidance to the next musician who seeks to express political views and wants to do so to the fullest extent protected by the First Amendment. It offers no framework for a school district faced with the possibility of punishing (and possibly expelling) a student who has created a tasteless website or made derogatory and potentially threatening comments on social media. It affords no paradigm for application to the teacher who is fired, the police officer who is suspended, or the municipal employee who is disciplined. The reach of today's decision is far more expansive than criminal cases alone. Governmental bodies should know whether they can take punitive actions against students, employees, or officers if those individuals act with something less than specific intent. Similarly, individuals should not be subjected to termination, suspension, or extended desk duty only to find out years later than their

conduct was not prohibited by the First Amendment. The issue is more than ripe for disposition, and the reasons to reach it are compelling.

Following *Black*, federal appeals courts have split over whether the subjective intent of a speaker is a necessary component of an actual true threat. *See United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (opining that, after *Black*, "whether the Court meant to retire the objective 'reasonable person' approach or to add a subjective intent requirement to the prevailing test for true threats is unclear"). Recent cases have attempted to parse the "type of intent needed by a defendant to communicate" a true threat for purposes of the various threat provisions in the United States Criminal Code[2] in the wake of *Black*. *See, e.g., United States v. Clemens*, 738 F.3d 1, 2 (1st Cir. 2013).

The First, Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits have determined that the *Black* Court did not impose a subjective intent requirement upon the analysis. Those Circuits eschew such an element, and instead apply an objective test focused upon either a hypothetical reasonable speaker or a hypothetical reasonable recipient/listener. *See Clemens*, 738 F.3d at 10 (assessing threats based upon "an objective defendant vantage point standard post-*Black*"); *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006) ("The test is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury."); *United States v. Elonis*, 730 F.3d 321, 331 n.7 (3d Cir. 2013), *rev'd by Elonis v. United States*, 135 S. Ct. 2001 (2015) (describing the Third Circuit test as asking "whether a reasonable speaker would foresee the statement would be understood as a threat"); *United States v. White*, 670 F.3d 498, 508 (4th Cir. 2012), *abrogated by United States v. White*, 810 F.3d 212 (4th Cir. 2016) (explaining that a statement constitutes a true threat "if an ordinary reasonable recipient who is familiar with the context . . . would

---

[2]     *See, e.g.*, 18 U.S.C. § 875(c) ("Interstate Transmission of Threat to Injure").

interpret [the statement] as a threat of injury") (internal quotation marks omitted); *United States v. Jeffries*, 692 F.3d 473, 479 (6th Cir. 2012) (holding that a statement constitutes a true threat when "a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus)"); *Parr*, 545 F.3d at 499 (noting that the circuit traditionally has used an "objective reasonable person" test, and declining to decide whether *Black* necessitated an alteration to that test under the circumstances of that case); *United States v. Nicklas*, 713 F.3d 435, 440 (8th Cir. 2013) (holding that the government is required "to prove a reasonable recipient would have interpreted the defendant's communication as a serious threat to injure").

The Fifth and Eleventh Circuits adopted a more general reasonable person test, with no specific reliance upon either the speaker or the listener. *See Porter v. Ascension Parish Sch. Bd.,* 393 F.3d 608, 616 (5th Cir. 2004) (explaining that "[s]peech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm") (internal quotation marks omitted); *United States v. Martinez*, 736 F.3d 981, 988 (11th Cir. 2013), *vacated by Martinez v. United States*, 135 S. Ct. 2798 (2015) (*per curiam*) (holding that a true threat is "determined from the position of an objective, reasonable person").

The Ninth and Tenth Circuits read *Black* as requiring the true threats analysis to focus upon the speaker's subjective intent to intimidate a person or group of persons. *See United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005) ("We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."); *United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005) ("Unprotected by the

Constitution are threats that communicate the speaker's intent to commit an act of unlawful violence against identifiable individuals. The threat must be made with the intent of placing the victim in fear of bodily harm or death.") (internal citations and quotation marks omitted); *United States v. Heineman*, 767 F.3d 970, 972, 975, and 978 (10th Cir. 2014) (quoting the reasonable recipient test, but also adding a requirement that the government prove that the defendant intended the recipient to feel threatened). *But see United States v. Wheeler*, 776 F.3d 736, 743 n.4 (10th Cir. 2015) (limiting the *Heineman* analysis to the statutory definition of a true threat, and holding that the subjective test was not part of a First Amendment analysis).

As noted, the Majority holds only that the First Amendment permits regulating speech that is specifically intended to be a true threat. The Majority does not consider whether specific intent is the only *mens rea* that would pass constitutional muster. For this reason, the Majority explains that the Court is "not fully aligned with" the Ninth Circuit's rule that specific intent is "the *sine qua non* of a constitutionally punishable threat." Maj. Op. at 17 n.10 (quoting *Cassel*, 408 F.3d at 631). Contrary to the Majority, I endorse the Ninth Circuit's holding, and I would adopt it in this case. In my view, the Ninth Circuit correctly determined that the reasoning underlying the Supreme Court's *Black* decision necessitates the conclusion that the First Amendment requires such a subjective examination, and that proof of the speaker's intent to intimidate the recipient of the communication is a required inquiry in order to balance the need to protect victims of threats with the First Amendment rights of the speaker.

It is crucial that we not forget that punishing a person for communicating a true threat, however reasonable it seems, is a content-based regulation of speech. As a general rule, the First Amendment prohibits content-based restraints. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citing *Cantwell v. Connecticut*, 310 U.S. 296,

309-11 (1940); *Texas v. Johnson*, 491 U.S. 397, 406 (1989)).  Indeed, "[c]ontent-based regulations are presumptively invalid."  *Id.* (citations omitted).  Thus, the ability to punish a true threat based upon its content is an exception to the general prohibition.  The Supreme Court has insisted that content-based categories of speech that can be regulated be narrowly drawn.  *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942).  A content-based proscription of speech that is premised upon something less than the most rigorous standard is a proscription that is not narrowly drawn, particularly when considering true threats in the context of musical expression.  *See, e.g., Pap's A.M. v. City of Erie*, 812 A.2d 591, 612 (Pa. 2002) (explaining that a content-based city ordinance restricting First Amendment rights passes constitutional muster only if it is narrowly drawn and if the municipality can show a compelling state interest, *i.e.*, strict scrutiny).  Punishing statements that can be construed only as knowingly or recklessly uttered casts a net too wide, as it catches up and penalizes an impermissible amount of protected speech and breeds a "threat of censorship that by its very existence chills free speech."  *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 964 n.12 (1984) (citations omitted).  After all, the United States Supreme Court has mandated that "First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327 (2010) (citations and internal quotation marks omitted).  Proof of specific intent strikes the correct balance between prosecuting that which is unprotected and shielding that which is protected.

However, like the Majority, I also would hold that consideration of a speaker's mindset is only part of the analysis, and would adopt a two-pronged approach to evaluating a true threat for constitutional purposes.  First, I would require reviewing courts to conduct an objective analysis to determine whether reasonable recipients would

consider the statement to be "a serious expression of intent to inflict harm," and not merely jest, hyperbole, or a steam valve. *J.S.*, 807 A.2d at 858. For this purpose, I believe that the factors that we delineated in *J.S.*, a case I discuss in detail below, are relevant and useful. Those factors include: "the statements, the context in which they were made, the reaction of the listeners and others as well as the nature of the comments." *Id.* No one factor should be considered conclusive, and each should be considered and analyzed, alone and against the others, under the totality of the circumstances. Second, if the first prong is satisfied, I would require courts to conduct a subjective analysis to ascertain whether the speaker specifically intended to intimidate the victim or victims, or intended his expression to be received as a threat to the victim or victims. Failure of the government to satisfy either prong would mean that, under the First Amendment, the statement cannot be penalized or proscribed.

This framework balances the relevant interests at stake, ensuring that only true threats—those that are intended as such—are punished while, at the same time, shielding otherwise-protected speech from unwarranted governmental proscription. The first prong of my proposed test allows courts to determine objectively whether a statement is a threat and not political hyperbole, as was the case in *Watts*, or an instance of sophomoric utterances that could not be taken seriously, like those that we determined were not true threats in *J.S.* The second prong requires proof that the speaker's purpose was to strike fear in the victim, which further justifies exempting the statement from constitutional protection.

All that remains is application of my proposed test. I begin with the objective prong of the analysis. The most natural starting place, and the first *J.S.* factor, is the words of the purported threat.

Words matter. Indeed, the actual words used by the speaker to convey a thought are one of the strongest indicators of whether an utterance objectively should be perceived as an actual threat. However, those words cannot be read in isolation. An objective assessment necessarily requires consideration of the circumstances in which the statement was made. In this instance, the threats were part of a song. This makes an objective consideration of the threatening language more difficult than with other forms of communication, as music often is rife with hyperbole, boasting, exaggerated attempts at entertainment, overheated invocation of emotion, and nonsensical banter. Of course, that the statements were made in a song does not exempt them from being true threats. But it does complicate the task of determining which lyrical statements objectively should be taken seriously and which should not.

In some instances, the answers are obvious. For example, compare Coolio's "Gangsta's Paradise"[3] with "Weird Al" Yankovic's "Amish Paradise."[4] In "Gangsta's Paradise," Coolio reflects upon the difficulties that he has faced in life and upon the cycles of greed and violence in his community. It is readily apparent that Coolio's song is meant to convey a message that is serious, thoughtful, and personal. On the other hand, Yankovic's song is an obvious parody of "Gangsta's Paradise," premised upon silliness and meant to provoke laughter. Unlike "Gangsta's Paradise," Yankovic's lyrics are not meant to (and cannot) be taken seriously.

In most cases, however, determining whether the lyrics of a particular song are serious, credible statements is more challenging. The difficulty arises from the nature of song lyrics themselves. Artists often use hyperbole in their songs to illustrate emotion.

---

[3] COOLIO, GANGSTA'S PARADISE (Tommy Boy 1995).

[4] "WEIRD AL" YANKOVIC, AMISH PARADISE (Scotti Brothers 1996).

The Beatles, for example, insisted that they "ain't got nothin' but love babe, eight days a week."[5] The hyperbole is obvious. But the exaggeration may not always be so apparent. Artists sometimes employ metaphors that defy clear definition. Consider the song "Drops of Jupiter" by Train, in which the artists ask, "Did you finally get the chance to dance along the light of day and head back to the Milky Way?"[6] Song lyrics may even lack any discernible meaning on their own, as in The Beatles' classic "Lucy in the Sky with Diamonds," which includes the instruction, "follow her down to a bridge by a fountain where rocking horse people eat marshmallow pies."[7]

Musicians sometimes use violent themes to communicate political messages. In "Bulls on Parade," Rage Against the Machine uses violent imagery ("With the sure shot, sure ta make the boddies drop . . . of tha power dons - that five sided Fist-a-gon . . . the trigger's cold, empty ya purse"[8]) as a political statement to criticize the United States government and its military. In his song "Courtesy of the Red, White, and Blue," Toby Keith employs violent imagery ("We'll put a boot in your ass, it's the American way"[9]) as a political statement to voice support for the United States Armed Forces. Others use violent lyrics to depict actual events, but the lyrics do not necessarily reflect the life of the artist. In "Delia's Gone," Johnny Cash sang: "If I hadn't shot poor Delia I'd have had her

---

[5] THE BEATLES, EIGHT DAYS A WEEK (Parlophone 1964).

[6] TRAIN, DROPS OF JUPITER (Columbia 2001).

[7] THE BEATLES, LUCY IN THE SKY WITH DIAMONDS (Parlophone 1967).

[8] RAGE AGAINST THE MACHINE, BULLS ON PARADE (Evil Empire 1996).

[9] TOBY KEITH, COURTESY OF THE RED, WHITE, AND BLUE (THE ANGRY AMERICAN) (DreamWorks Nashville 2002).

for my wife."[10]  Although this song is written in the first person and depicts a murder, it actually is a cover of a song about a fourteen-year-old adolescent who was murdered in 1900.  SEAN WILENTZ, BOB DYLAN IN AMERICA (2011).

Songs also may contain lyrics that appear facially threatening, but that still constitute protected speech.  The band Foster the People produced a song called "Pumped Up Kicks," which describes a school shooting and warns, "All the other kids with the pumped up kicks you'd better run, better run, out run my gun."[11]  Further, the rap group N.W.A., in their song "Fuck tha Police," expressly described violence against police officers, stating, "and when I'm finished, it's gonna be a bloodbath of cops dying in L.A. . . . I'm a sniper with a hell of a scope / taking out a cop or two, they can't cope with me."[12] These examples illustrate that, when song lyrics are read in isolation, the task of distinguishing between words that should be understood as serious, true threats, and those which should be understood as lyrical devices is complex, to say the least.

With this in mind, I turn to the lyrics at issue herein.  The words of Knox's rap song were not general or vague as to the targets, a circumstance that would have militated against a finding of a true threat.  Had the lyrics been directed at police officers generally, or had they complained about perceived abuses by unnamed police officers, those lyrics objectively could have been understood as political commentary or as a musical ventilation of frustration about the rappers' real-life experiences.  That is not what occurred in this case.

---

[10]    JOHNNY CASH, DELIA'S GONE (Columbia 1962); *see also* JOHNNY CASH, FOLSOM PRISON BLUES (Sun Records 1957) ("But I shot a man in Reno just to watch him die.")

[11]    FOSTER THE PEOPLE, PUMPED UP KICKS (Columbia 2011).

[12]    N.W.A., FUCK THA POLICE (Ruthless Records 1988).

In response to being arrested and charged with drug-related crimes months before the release of the video, Knox used lyrics that not only were facially threatening, but were directed specifically at Officer Kosko and Detective Zeltner, whom Knox identified in the song by name. The following excerpts from the verses performed by Knox compel my conclusion that Knox's statements objectively must be considered threatening for constitutional purposes:

> The first verse is for Officer Zeltner and all you fed force bitches
> And Mr. Kosko, you can suck my dick, you keep knocking my riches.
> You want beef, well cracker I'm wit it, that whole department can get it.
> All these soldiers in my committee gonna fuck over you bitches
> Fuck the police bitch, I said it loud
>
> * * *
> We makin' prank calls, as soon as you bitches come we bustin' heavy metal
>
> So now they gonna chase me through these streets
> And I'm a jam this rusty knife all in his guts and chop his feet
> You takin money away from Beaz, and all my shit away from me
> Well your shift over at three and I'm gonna fuck up where you sleep
> * * *
> My Northview niggas they don't fuck with you bitches, I hate your fuckin guts, I hate y'all.
> My momma told me not to put this on C.D., but I'm gonna make this fuckin city believe me, so nigga turn me up.
> * * *
> They tunin' in, well Mr. Fed, if you can hear me bitch,
> Go tell your daddy that we're booming bricks.
> And them informants that you got, finna be layin in the box
> And I know exactly who workin', and I'm gonna kill him wit a Glock.

The instances of obvious hyperbole ("chop his feet") do not disturb our interpretation of this factor. These passages—even without considering the statements made during the co-author's verses—contain direct threats to named individuals. Knox threatened those officers with firearms ("bustin' heavy metal") and with knives ("I'm a jam this rusty knife all in his guts"). Knox's lyrical intimidation also extended to the officers' family homes ("I'm gonna fuck up where you sleep"). Knox's proclamation that he knew

when the officers' shifts end ("your shift over at three")—regardless of whether the statement was true—conveyed a more personal message that the officers were being watched, lending credibility to the statements and further elevating them over hyperbole or mere musical embellishments. Knox also indicated that he knew the identities of the officers' confidential informants, and threatened them as well.

It bears repeating that the aim of the law in the jurisprudence of threats is to deter and/or remedy the intimidation and fear that such statements inflict upon the victim(s). Many of the lyrics that discuss or advocate violence would not, by themselves, amount to true threats. In fact, as the examples from popular music show, violent topics often are expressed in music without being considered threatening to any particular individual(s), and could not and should not be regulated or punished. What separates this case from other music containing similar lyrics is the direction of those lyrics to specifically named officers, who are targeted as the objects of the violent expressions. Objectively, lyrics uttered in this manner are too personal, focused, and specific to be considered anything other than true threats.

Next, I consider the context in which the statements were made. As the District of Columbia Court of Appeals observed, "a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening." *In re S.W.*, 45 A.3d 151, 157 (D.C. 2012) (footnotes omitted). The lyrics in "Fuck the Police" were not created and sung as part of a broader political commentary on the state of affairs between the police and the citizenry, were not facially hyperbolic or satirical, and did not constitute any other form of speech that would receive constitutional protection. The lyrics were drafted and recorded in the wake of, and in direct response to, Knox's arrest and receipt of

criminal charges at the hands of the two named officers. At the time that the song was uploaded to YouTube, the earlier criminal charges were pending, with a hearing less than one month away, at which the two named officers were scheduled to testify against Knox and Beasley.

As part of the examination of the context in which the statements were made, it is necessary to review the means by which the statements were conveyed to the victim(s). The actual communication of the video is the aspect of the case that Knox most vigorously disputes. The crux of his argument is that, because of the dearth of evidence of record to establish that he actually created, uploaded, or published the video, he cannot constitutionally be liable for making a threat. Knox maintains that authorship of a threatening song is only one half of a true threat. The other half is the actual communication of the threat. Absent evidence of the communication, he argues, the song lyrics are no different than writing threats in a personal journal or diary, which are not intended to be seen by anyone else. *See* Brief for Knox at 36. In Knox' view, the threat can be attributed to him only if the Commonwealth proves that he was the actual person who struck the computer key that caused the video to be uploaded to YouTube.

Knox is correct that the Commonwealth did not prove that he uploaded the video. The evidence confirms that the video was uploaded using an IP address connected to the Hart family, and that the police could not connect Knox with the Harts. Moreover, the police were unable to link Knox to any of the cell phones that had access to the IP address at the time that the video was uploaded. These factors would be dispositive if Knox was correct that he can be responsible only if he personally caused the video to be uploaded. But this is not the law. Knox takes too narrow a view of communication in this context.

Knox and Beasley jointly authored and recorded the "Fuck the Police" song. Both men sang individual verses in the song. The video displays two still photos of Knox and

Beasley standing together in corresponding outfits. This was not the duo's first song together. At least two other videos were posted to YouTube in which Knox and Beasley are rapping or talking with each other. Their music, including "Fuck the Police," was promoted to the public via the "Beaz Mooga" Facebook page. There was ample evidence demonstrating that Beasley operated the page. The three email addresses that were associated with the page all contained some form of the name Rashee Beasley. Posts on the page celebrated Beasley's birthday and referenced events that corresponded to actual events in Beasley's life.

The totality of these circumstances establish a sufficient link between the creation of the song and video, its publication and promotion, and Knox. Knox was sufficiently involved in the process such that he cannot now demand immunity concerning the song's threats simply because someone else may have actually uploaded the video. Knox made no efforts to stop either the dissemination or the promotion of the song. These circumstances differ entirely from Knox's personal diary hypothetical. The record contains ample evidence to conclude that Knox was at least a complicit bystander in the publication of the video.

Having determined that Knox is not immune from liability for the threat, it bears noting that the manner by which a threat is communicated is often as important as the words themselves in an objective assessment of whether a statement amounts to a true threat. Using the example offered by Knox as an illustration, a threat—one intended to be such—that a person writes in a personal journal and that is never seen by the desired victim is unlikely to be considered objectively an actionable true threat. In such a circumstance, the intended victim is never subjected to the fear or intimidation that true threat jurisprudence aims to punish. On the other end of the spectrum, a threat that is

delivered face-to-face to the victim in a menacing way almost always will constitute a threat.

The means of communication in this case fall somewhere between those two extremes. The video was distributed to the public via YouTube, and subsequently promoted on Facebook by Beasley, Knox's cohort and musical partner. Neither Knox nor Beasley sent the video directly to any police officer, police department, or local media outlet. Nonetheless, the obvious purpose of uploading a video to the Internet is for it to be viewed and shared. It is reasonable to conclude that, even though the video was not sent directly to the two named officers, it ultimately would be discovered by them as a result of general dissemination in today's electronically connected world. It is also fair to conclude that, once the video went public, Knox and Beasley knew that it would find its way to the named officers.

Notably, Knox took no efforts to prevent the video from being viewed by law enforcement authorities. To the contrary, Knox offered at least some indicia in the song itself that he did not want to restrict its access to a limited or personal audience ("My momma told me not to put this on C.D., but I'm gonna make this fuckin city believe me. . .").

Absent direct conveyance specifically to the named officers (*i.e.*, the "in your face" scenario), the communication aspect of this case is not overwhelming or conclusive. However, in light of the above discussion, the communication factor nonetheless weighs against Knox. Thus, the contextual circumstances support the conclusion that the lyrics in this case constituted true threats.

The final *J.S.* factor that is relevant to this case, the reaction of the listeners, also supports this holding. This factor was a significant aspect of the Supreme Court's threats analysis in *Watts*, which marked the genesis of the true threats exception to the First

Amendment.  *See, supra*, note 1.  It is one of the more difficult factors to assess in a reliable manner.  People differ in gender, race, religion, and, most importantly, experience.  One person may be emotionally stoic and might not react at all to hearing a threat, while another person might panic immediately and call the police upon hearing the same threat.  A person's recent life experiences, the highs and the lows, might inform his or her reaction in that moment, and that reaction may be different than if the threat was heard a week or a month later (or before).  Police officers might or might not react differently to a threat than would a hardened criminal.  The scenarios and hypotheticals go on and on.  The examples are innumerable, which is what makes assessing the reasonableness of a listener's reaction difficult.

Despite the general complexity of this aspect of the analysis, the factor is easily resolved in this particular case.  Officer Spangler was the first police officer to hear the song.  When he heard the threatening lyrics, he promptly forwarded the song to his supervisors and to Officer Kosko and Detective Zeltner.  As this was happening, a local media outlet found the song and began reporting on it, apparently believing it to contain actual threats as well.  Officer Kosko and Detective Zeltner were prevented from working alone, and the police presence in the entire area was increased.  Both officers were emotionally distraught by the lyrics.  Detective Zeltner was given time off and was provided with additional security when he returned to work.  Officer Kosko chose to retire one year after hearing the song.  The song necessitated significant efforts to ensure the safety of the two named officers, as well as the officers and civilians in the local community.  This factor strongly weighs in the direction of a true threat.

All of these factors support concluding that, objectively, the lyrics in this case constitute true threats. Thus, under my proposed test, I now must consider whether Knox intended them as such.

For this factor, I rely upon much of the same evidence, but view it from a subjective perspective. The tone of the lyrics chosen for this song demonstrates clearly that Knox was angered by his prior arrest and the effect that the arrest had upon his financial situation. The rage apparent in the lyrics alone would not justify a conclusion that Knox intended the lyrics to be threatening. However, the fact that Knox directed the threats specifically at Officer Kosko and Detective Zeltner does. I discern no credible argument that naming those two individuals served any purpose other than to instill fear in them. The timing of the threats is important as well. The charges that prompted the song lyrics were pending at the time that the song was published. The two officers were slated to appear in person and testify against Knox and Beasley at a hearing approximately one month later. Additionally, Knox referred specifically to the types of violence that he would inflict and when and where he would inflict them. Knox also revealed his motive for levying these threats in the song: revenge for the prior arrest, which harmed his ability to make money through drug trafficking. In the aggregate, the evidence of Knox's subjective intent is plentiful.

For these reasons, I concur with the Majority that Knox's lyrics constitute true threats, and that those lyrics do not receive First Amendment protection. Before concluding, however, I must acknowledge the similarities between this case and *J.S.*, in which this Court reached an opposite conclusion. J.S., an eighth-grade student in the Bethlehem Area School District, created a website on his home computer and uploaded it to the Internet. The website was not related to any school program, assignment, or project. When a person accessed the website, the front page consisted of a "disclaimer," which informed the viewer that, by clicking through and entering the website, the viewer agreed: (1) not to report to anyone affiliated with the school district what the viewer was about to see; (2) that the viewer was not an employee of the district; and (3) that the

viewer would not disclose to anyone the identity of the creator of the website and would not cause any trouble for the creator. Although styled as a disclaimer, the front page did not actually bar access to anyone and was not password-protected. Any person who wanted to access the site could view it simply by clicking through the front page. *Id.* at 851.

The main pages of the website contained derogatory, profane, and threatening statements directed primarily at the principal of the middle school, A. Thomas Kartsostis, and at J.S.' algebra teacher, Kathleen Fulmer. This Court provided the following description of content of the various pages within the website:

> Within the website were a number of web pages. [C]ertain of the web pages made reference to Principal Kartsostis. Among other pages was a web page with the greeting "Welcome to Kartsostis Sux." Another web page indicated, in profane terms, that Mr. Kartsostis engaged in sexual relations with a Mrs. Derrico, a principal from another school, Asa Packer School.
>
> The web site also contained web pages dedicated to Mrs. Fulmer. One page was entitled "Why Fulmer Should be Fired." This page set forth, again in degrading terms, that because of her physique and her disposition, Mrs. Fulmer should be terminated from her employment. Another animated web page contained a picture of Mrs. Fulmer with images from the cartoon "South Park" with the statement "That's right Kyle [a South Park character]. She's a bigger b___ than your mom." Yet another web page morphed a picture of Mrs. Fulmer's face into that of Adolph Hitler and stated "The new Fulmer Hitler movie. The similarities astound me." Furthermore, there was a hand-drawn picture of Mrs. Fulmer in a witch's costume. There was also a page, with sound, that stated "Mrs. Fulmer Is a B___, In D Minor." Finally, along with criticism of Mrs. Fulmer, a web page provided answers for certain math lessons.
>
> The most striking web page regarding Mrs. Fulmer, however, was captioned, "Why Should She Die?" Immediately below this heading, the page requested the reader to "Take a look at the diagram and the reasons I gave, then give me $20 to help pay for the hitman." The diagram consisted of a photograph of Mrs. Fulmer with various physical attributes highlighted to attract the viewer's attention. Below the statement questioning why Mrs. Fulmer should die, the page offered "Some Word from the writer" and listed 136 times "F___ You Mrs. Fulmer. You Are A B___. You Are A Stupid B___." Another page set forth a diminutive drawing of Mrs. Fulmer with her head cut off and blood dripping from her neck.

*Id.* at 851 (footnotes omitted). Eventually, the principal learned of, and viewed, the website. Because he considered the threats to be serious, he informed the school faculty that there was a problem at the school, and he contacted the local police and the FBI, both of which ultimately declined to pursue charges against J.S.

Mrs. Fulmer also viewed the site. She became concerned for her safety. Worse, she experienced, *inter alia*, stress, anxiety, short-term memory loss, headaches, and depression. She was unable to finish the school year, and was afforded medical leave for the following school year. *Id.* at 852.

J.S. continued to attend the school and was not required to take down the website, although he did so voluntarily one week after the principal viewed it. Initially, the District did not punish J.S. However, at the conclusion of the school year, the District informed J.S.' parents that J.S. would be suspended for three days because J.S.' website constituted a threat to a teacher, harassment of a teacher and the principal, and disrespect to both, all of which affected the health, safety, and welfare of the school community.

The District held a hearing on the suspension, at which the District elected to extend the suspension from three days to ten days. After the hearing, the District reconsidered the suspension and commenced expulsion proceedings against J.S. The District conducted two expulsion hearings before the start of the new school year. J.S. did not attend the second hearing because, by that time, his parents had enrolled him in a school in a different state. At the conclusion of the hearings, the District determined that the website contained threats and harassment directed at a teacher and the principal that resulted in harm to the school community. Consequently, the District expelled J.S. *Id.* at 853.

J.S.' parents appealed the expulsion, maintaining that the sanction violated J.S.' First Amendment rights. The case ultimately reached this Court, which then turned to examine the "difficult issue of whether a school district may, consistent with the First Amendment to the United States Constitution, discipline a student for creating at home, and posting on the Internet, a website that . . . contained . . . threatening statements directed toward one of the student's teachers and his principal." *Id.* at 850.

After discussing basic tenets of the First Amendment, the Court considered how those principles "intersect with the unique school setting," which we described as "a complex and delicate task." *Id.* at 855. "Schools are given the monumental charge of molding our children into responsible and knowledgeable citizens." *Id.* On balance, both the United States Supreme Court and this Court have concluded that a student's constitutional interests must give way—in certain circumstances—to the institutional needs of a school. This includes the student's right to freedom of expression. With this framework in mind, the Court turned to the question of whether J.S.' statements on his website amounted to true threats.

This Court recounted the Supreme Court's *Watts* decision, and observed that the High Court "has offered little more since rendering its decision . . . in terms of guidelines to adjudge what constitutes a true threat." *Id.* at 857.[13] We considered extra-jurisdictional cases that have "attempted to further define what constitutes a true threat and to create a standard to evaluate speech alleged to constitute a true threat." *Id.* at 857-58

---

[13] At the time that the *J.S.* Court considered what constituted a true threat, our Superior Court had been relying upon the United States Court of Appeals for the Second Circuit's decision in *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976). *See Commonwealth v. Baker*, 722 A.2d 718, 722 (Pa. Super. 1998), *aff'd*, 766 A.2d 328 (Pa. 2001). In *Kelner*, the Second Circuit opted to define a true threat as one that "on its face and in the circumstances in which it is made is so unequivocal, unconditionally immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *Kelner*, 534 F.2d at 1027. This Court has never adopted *Kelner*'s definition.

(discussing *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367 (9th Cir. 1996); and *In the Interest of A.S.*, 626 N.W.2d 712 (Wis. 2001)). Both the United States Court of Appeals for the Ninth Circuit and the Supreme Court of Wisconsin had employed an objective reasonable person standard, inquiring whether the speaker would reasonably foresee that the statement would be interpreted as a serious expression of purpose or intent to inflict harm. *See Lovell*, 90 F.3d at 372; *In the Interest of A.S.*, 626 N.W.2d at 720. To ensure that the statement was not mere "hyperbole, jest, innocuous talk, expressions of political views or other similarly protected speech," *J.S.*, 807 A.2d at 858, the Supreme Court of Wisconsin had held that courts in that state, using a totality of the circumstances approach, were bound to consider the following factors:

> how the recipient and other listeners reacted to the alleged threat; whether the threat was conditional; whether it was communicated directly to its victim; whether the makers of the threat had made similar statements to the victim on other occasions; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

*In the Interest of A.S.*, 626 N.W.2d at 720. Five years earlier, the Ninth Circuit had prescribed a similar set of factors in articulating an objective standard for consideration of a purported true threat. *Lovell*, 90 F.3d at 372.

In *J.S.*, we found *In the Interest of A.S.* and *Lovell* compelling and consistent with the Supreme Court's holding in *Watts*. We concluded the "reasonable guideposts" offered by the Ninth Circuit and the Wisconsin Supreme Court were helpful in differentiating between a true threat and protected speech. We held that, to determine whether a statement is "a serious expression of intent to inflict harm," Pennsylvania courts must "consider the statements, the context in which they were made, the reaction of the listeners and others as well as the nature of the comments." *J.S.*, 807 A.2d at 858.

Following careful deliberation upon these factors, this Court held, ultimately, that J.S.' statements were not true threats. We acknowledged, *inter alia*, that the statements

and images on the website were not conditional, and that they contributed to a significant impairment to Mrs. Fulmer's well-being and to her career. Nevertheless, we found it important that the threatening statements were not communicated directly to Mrs. Fulmer. To the contrary, the "disclaimer" indicated that J.S. did not want school faculty to view the material on the site. Moreover, there were no indications that J.S. had made other threatening statements to Mrs. Fulmer, and it was "unclear if Mrs. Fulmer had any reason to believe that J.S. had the propensity to engage in violence, more than any other student of his age." *Id.* at 859.

We observed that a student's First Amendment rights, though limited, are not vitiated entirely by the fact of his being a student, and we recognized the criminal nature of a true threat analysis. *Id.* at 856, 859, and 861. Accordingly, we held that the totality of the circumstances did not support the School District's determination that the website contained sanctionable true threats:

> [T]he web site, taken as a whole, was a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody. However, it did not reflect a serious expression of intent to inflict harm. This conclusion is supported by the fact that the web site focused primarily on Mrs. Fulmer's physique and disposition and utilized cartoon characters, hand drawings, song, and a comparison to Adolph Hitler. While Mrs. Fulmer was offended, certain others did not view it as a serious expression of intent to inflict harm. Indeed, the actions, or inaction, by the School District belies its assertion that the web site constituted a true threat. To allow J.S. to attend class and extracurricular activities, even if during an investigation, and to only commence discipline well after the conclusion of the school year, severely undermines the School District's position that the web site contained a true threat. The lack of immediate steps taken directly against J.S., and the lack of immediate notification of his parents about the web site, for the extended time period that passed in the case, strongly counters against a conclusion that the statements made in the web site constituted true threats.

*Id.* at 859-60 (footnote omitted).[14]

In the case *sub judice* and in *J.S.*, threatening language was communicated by an online medium. In both situations, the targets of the threats were named specifically, a factor to which I assign great weight in today's case. In *J.S.*, we found it particularly important that the threats were not communicated directly to Mrs. Fulmer, *see* 807 A.2d at 859, just as the threats in this case were not communicated directly to Officer Kosko or Detective Zeltner. Mrs. Fulmer suffered emotional trauma, perhaps even more extensively than did the officers here.

Despite these similarities, it is the content of the threats that distinguishes the present case from *J.S.* We ultimately concluded that the eighth grader's statements in *J.S.* objectively could not be taken seriously, characterizing the threats against Ms. Fulmer as "a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody." *Id.* The depictions of Ms. Fulmer were cartoons, drawings, and absurd comparisons to Adolph Hitler. The same cannot be said here. Although the cases share numerous similarities, the threats themselves do not. Here, the threats to the officers were real, specific, and violent, with nothing of record to indicate that the threats should not be taken seriously or that Knox and Beasley were unable to carry them out. I discern no substantive basis that would compel us to relegate Knox's threats to the same category into which we cast J.S.' threats. Hence, I find *J.S.* to be readily distinguishable.

---

[14] Ultimately, this Court held, while the School District could punish J.S. for his expressive conduct pursuant to the United States Supreme Court's decision in *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503 (1969) (holding that a school district may prohibit or punish speech if it demonstrates that the student speech materially disrupts class work, results in substantial disorder in the school, invades the rights of others, or if it is reasonably foreseeable that the speech will do so), the basis for such punishment must rest upon school disruption rather than on the assertion of a true threat. Relying upon *Tinker*, we held that the website "created disorder and significantly and adversely impacted the delivery of instruction." *J.S.*, 807 A.2d at 869. Thus, the District's disciplinary action did not violate J.S.'s First Amendment rights. *Id.*

Ultimately, because I agree with the result reached by the Majority, I concur. However, I respectfully dissent as to the analysis developed and used by the Majority.

Justice Donohue joins this concurring and dissenting opinion.